**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Kelly Rolan WANTZ, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 18, 2013.

Filed Jan. 14, 2014.

Thomas A. Archer, Harrisburg, for Appellant.

Adam J. Barr, Assistant District Attorney, Gettysburg, for Commonwealth, appellee.

BEFORE: DONOHUE, SHOGAN and MUSMANNO, JJ.

OPINION BY DONOHUE, J.:

Appellant, Kelly Rolan Wantz ("Wantz"), appeals from the order entered on March 7, 2013, denying his petition for relief pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–46 ("PCRA"). For the reasons that follow, we affirm the PCRA court's order.

On January 27, 2005, Wantz was home alone with his one-month old twin boys in Littlestown Borough, Adams County, when he observed that one of his sons, J.W., was unresponsive and having trouble breathing. N.T., 3/25/2008, at 234–46. Wantz called 911 and J.W. was taken by ambulance to Gettysburg Hospital, with Wantz following in his vehicle. *Id.* at 243–46. Upon initial examination, it was medically determined that J.W. should be flown to Hershey Medical Center for specialized care. *Id.* at 249. Wantz did not follow J.W. to Hershey Medical Center, but instead drove himself home. *Id.* at 250.

At Hershey Medical Center, Dr. Mark Dias ("Dr. Dias"), a pediatric neurosurgeon, undertook the treatment of J.W. During the first two days, Dr. Dias treated J.W. for seizures. CT scans and MRIs revealed blood and swelling in the child's brain. J.W. could not swallow safely and required a feeding tube. Hospital staff reported J.W.'s injuries to the Adams County Children and Youth Services ("CYS"). On January 31, 2005, a CYS caseworker and a Littlestown Borough police officer interviewed Wantz. Wantz told them that he had just put the twins in their car seats to feed them when J.W. became quiet, at which time he rocked the car seat to prevent him from going to sleep. N.T., 3/25/2008, at 309–11. Wantz said that J.W.'s head then "flopped," he felt cold, and he could not breathe properly—at which time Wantz immediately called 911. *Id.* at 310. During this interview, Wantz reportedly told the caseworker, "I'll say I did it. I don't care about jail. I'll say did it just to have the children back home with [their mother]. I'll just say I did it. I don't care. I'll just go to jail." N.T., 1/24/2008, at 58.

On February 2, 2005, CYS filed a petition seeking to have J.W. declared a dependent child. The juvenile court held adjudication hearings on April 8, May 26, and August 4, 2005. On April 8, 2005, Dr. Dias [1] testified that the CT and MRI scans

---

1. At the time of his testimony, Dr. Dias was the Director of Pediatric Neurosurgery, Vice

of J.W.'s head showed acute blood around both sides of his brain as well as the outside of the brain. Trial Court Opinion, 3/7/2013, at ¶ 10. The right side had a fluid collection that appeared to be chronic in nature. *Id.* The images also indicated a contusion to the right temporal lobe, reflective of a sudden deceleration of the brain while moving forward. *Id.* Dr. Dias found no evidence of a fracture or retinal hemorrhage. *Id.* In Dr. Dias' professional opinion, J.W. experienced a severe closed head injury due to an angular rotational acceleration of the head, typical of "shaken baby syndrome" or "shaken impact syndrome." *Id.* J.W.'s seizures were also strongly suggestive of angular acceleration rotation. *Id.* He could not determine if the injury was from a single or multiple incidents, but if from a single incident, Dr. Dias opined that it occurred on January 27, 2005. *Id.* In sum, Dr. Dias stated, within a reasonable degree of medical certainty, that J.W.'s injuries were consistent with a non-accidental trauma. *Id.*

On May 26, 2005, Wantz offered the testimony of Dr. Richard T. Callery ("Dr. Callery").[2] Dr. Callery reviewed J.W.'s prenatal and birth records as well as medical records related to his January 2005 hospitalization. N.T., 5/26/2005, at 16. Dr. Callery indicated that J.W.'s placenta had one artery (instead of two) and one vein. *Id.* at 16. According to Dr. Callery, this congenital abnormality of the placenta is associated with congenital defects and abnormality not apparent at birth, but which often appear within the first month. *Id.* at 17–18. As a result, Dr. Callery opined that J.W. had a high statistical chance of having an abnormal central nervous system. *Id.* at 19. In his testimony, Dr. Callery indicated that the radiological evaluation of the CT scan performed at Gettysburg Hospital on J.W. on January 27, 2005 described atrophy on the right brain hemisphere,[3] which can be caused by congenital abnormality of the placenta associated with anoxia. *Id.* at 18–20. Dr. Callery further testified that the same radiological evaluation of the CT scan showed "an increased density along the inner calvarial margin" associated with "calcification" rather than hemorrhaging. *Id.* at 21. Such calcification, sometimes referred to as encephalomalacia, is associated with atrophy caused by lack of oxygenated blood going to the brain during gestation. *Id.* at 21–22. This condition, according to Dr. Callery, could explain J.W.'s seizures upon hospitalization. *Id.* at 22. In sum, Dr. Callery opined to a reasonable degree of medical certainty that J.W.'s injury was not caused by an angular rotational acceleration of the head. *Id.* at 30. In further support of his conclusion, Dr. Callery also testified that tests revealed no injury to J.W.'s retina or optic nerves, a common condition present in shaken baby injury cases because of the viscosity of the vitreous fluid in an infant's eyes. *Id.* at 22, 27, 32.

On August 4, 2005, Dr. Robert A. Zim-

---

Chair of Neurosurgery, and Professor of Neurosurgery at Hershey Medical Center. He is board certified in pediatric neurosurgery. Trial Court Opinion, 3/7/2013, at 1 n.1.

**2.** At the time of his testimony, Dr. Callery was the Chief Medical Examiner for the State of Delaware and Director of the State Forensic Sciences Laboratory. N.T., 5/26/2005, at 4. He is licensed to practice medicine in Dela-

ware, Pennsylvania, Wisconsin, and Michigan. *Id.*

**3.** Dr. Callery testified that he is not trained to read and interpret CT scans himself, and that in offering his testimony he relied upon the report of the radiologist at Gettysburg Hospital (Dr. Joseph C. Jones ("Dr. Jones")). N.T., 5/26/2005, at 20, 31, 41, 46–47.

merman ("Dr. Zimmerman")[4] testified that he had reviewed the CT scans of J.W.'s brain on January 27, January 28, and February 4, 2005, and an MRI taken on January 28, 2005. Trial Court Opinion, 3/7/2013, at ¶ 12. The January 27 CT scan showed an extensive acute subdural hemorrhage on the top and left side of the head as well as a small amount of blood on the right side. *Id.* According to Dr. Zimmerman, this bleeding pattern is consistent with non-accidental infantile head trauma.[5] *Id.* The January 28 CT scan showed the same bleeding pattern as on the previous day's scan, and the MRI reflected an abnormality, mostly on the left side of the brain, indicating restricted motion of water in the brain tissue. *Id.* Dr. Zimmerman also observed cells that were injured and swollen. *Id.* On the February 4 CT scan, Dr. Zimmerman observed the abnormality seen in the earlier MRI, indicating evidence of a brain injury or cell death. *Id.* The cell damage had not been observable on the January 27 CT scan, but began to appear on the January 28 MRI. *Id.* Dr. Zimmerman opined that the appearance of bleeding on the left side of J.W.'s brain, and the lesser amount on the right side of the brain, was consistent with traumatic etiology of a recent injury (which he defined as occurring within 24 hours of the first CT scan). *Id.* Dr. Zimmerman observed no evidence of brain atrophy or prior low blood atoxic ischernic injury, as suggested by Dr. Callery. *Id.*

On December 5, 2005, the juvenile court adjudicated J.W. a dependent child.

On December 21, 2005, Wantz appeared at the Littlestown Police Department and left a handwritten note purportedly signed by him, which stated as follows:

I, Kelly R. Wantz, confess that on 1–27–05 I did bodily harm to [J.W.] I was alone ... What happened was a[n] accident. [J.W.] kept crying I shook him & threw him down in his crib ... Mother never knew about this.... I can't live with what I done [*sic*].

N.T., 1/25/2008, at 184; Exhibit 13.

On April 3, 2006, the Commonwealth charged Wantz with several crimes, including aggravated assault, 18 Pa.C.S.A. § 2702(a)(1), and endangering the welfare of children, 18 Pa.C.S.A. § 4304(a). On June 11, 2007, Wantz entered a plea of nolo contendere to the aggravated assault charge. Sentencing was deferred. On September 13, 2007, Wantz requested to withdraw his guilty plea, which request the trial court granted on September 17, 2007. On November 26, 2007, the trial court granted Wantz's request that trial be continued to the week of January 22, 2008 so that Dr. Callery could be present to testify.

A jury trial began on January 24, 2008. Dr. Dias and Dr. Zimmerman testified, but on the third day of trial and before the Commonwealth had finished presenting its evidence, the trial court had to declare a mistrial based upon Wantz's intoxication. Dr. Callery was in attendance in the courtroom.

The second jury trial commenced on March 24, 2008. Dr. Dias testified consistently with his prior testimony. N.T., 3/25/2008, at 122–67. He disagreed with Dr. Callery's prior testimony that placental abnormality could be a cause of the

---

4. Dr. Zimmerman is the Chief of Pediatric Neuroradiology at Children's Hospital of Philadelphia. Trial Court Opinion, 3/7/2013, at ¶ 12.

5. This testimony was significant in part because during his testimony, Dr. Callery agreed generally that the congenital abnormalities he described would not cause acute subdural hemorrhaging. N.T., 5/26/2005, at 44–46.

type of trauma suffered by J.W. *Id.* at 168–69. Dr. Dias estimated the timing of the injury as January 27, 2005 during the time when J.W. was in the care and custody of Wantz between 5:00 p.m. and 6:37 p.m. when he called 911. *Id.* at 170. Dr. Dias had two bases for this opinion: first, a research paper showing that in the "overwhelming majority of cases," the perpetrator is "the person who was with the child at the time the 911 call is made"; and second, another research paper concluding that the onset of abnormal breathing is a "marker of when the injuries occurred." *Id.* at 170–71.

The Commonwealth also introduced evidence of Wantz's statement to a CYS caseworker on January 31 ("I'll say I did it . . .") and the handwritten note Wantz had left at the police station on December 21, 2005. Having been advised that Dr. Callery would not be called to testify, the Commonwealth did not present any other medical testimony. In Dr. Callery's absence, Wantz (*pro se*) asked the trial court for a continuance to obtain a medical expert to testify about issues regarding congenital abnormalities, but the trial court refused, noting that "we are three years from the event and you're asking me to delay this trial for you to go on a fishing expedition when this is the third time this matter was scheduled for trial." *Id.* at 206–08. Wantz then testified on his own behalf, emphatically denying that he had shaken or otherwise harmed J.W. on January 27, 2005. *Id.* at 257. He also testified that he did not remember dropping off the note at the police station on December 21, 2005, but that he "probably wrote" it. *Id.* at 264–65.

The jury returned guilty verdicts on the aggravated assault and endangering the welfare of children charges. On June 30, 2008, the trial court sentenced Wantz on the aggravated assault conviction to a term of incarceration of six to fifteen years, to be followed by five years of probation. The trial court imposed no additional sentence on the conviction for endangering the welfare of children. On September 24, 2008, the trial court denied Wantz's post-sentence motions, and on January 19, 2011, this Court affirmed the judgment of sentence.

On November 7, 2011, Wantz, through counsel, filed the instant PCRA petition, in which he raised several claims of ineffective assistance of counsel, including the failure of trial counsel to call Dr. Callery at the second jury trial. The trial court conducted an evidentiary hearing on March 9, 2012, at which trial counsel, Dr. Callery, Wantz, and his father, Glenn Wantz, testified. Trial counsel testified that he decided not to call Dr. Callery as a witness at trial based upon a meeting with him on the first day of the first trial (which ended in a mistrial).

Q. Dr. Callery was present the first day of trial?

A. That's correct. May I explain? Yes he was. I had already talked to Dr. Callery and I think the Wantz family had paid him a fee. I talked to Dr. Callery, arranged for him to come down. He was reluctant to come but he did come the first day of that trial and we had a conversation on the fourth floor outside of Courtroom # 1, yes.

Q. Was his reluctancy to come associated with his advice to you that another expert [a neurosurgeon rather than a pathologist] would be appropriate?

A. No. If I may. He told—when he got there and I asked him about testifying, and I think the conversation was overheard by both [Wantz] and his father, Dr. Callery had been paid and this is exactly—I remem-

ber this outside of Courtroom # 4. He said: 'Mr. Chester, I reviewed my testimony from the CYS and my notes and I believe my testimony in that was incorrect, was in error. I do not wish to testify in this case because I cannot do [Wantz] any good. I do not want to affect my professional reputation' and that's exactly what he told me. Both gentlemen heard the conversation. Maybe not the whole conversation. That's exactly what he told me. If he got on the stand he said he would testify to the fact that he was in error in that case in some of his conclusions in the CYS trial and that in my opinion was not going to help [Wantz].

N.T., 3/9/2012, at 90–91. Accordingly, trial counsel decided not to call Dr. Callery to testify at the second jury trial, based in part on his belief that Wantz could achieve a successful outcome without expert testimony:

Q. At that point in time[,] what Dr. Callery told you at that point in time, did your opinion change as to the necessity of expert testimony in [Wantz'] defense?

A. Not really. My opinion on this case was that I did not think they had enough to convict this man of this case. After talking to him, he completely denied it. Reviewing the police reports and as I say this child had been handled by so many people that night and no one observed him shaking the child. I didn't believe we needed it, no.

Id. at 95.

At the evidentiary hearing, Dr. Callery testified that while he was reluctant to testify on Wantz's behalf, if called at the second trial he would have testified as requested. Id. at 19. He indicated that he would have explained that his review of J.W.'s birth records revealed that the child had suffered with breathing problems, perhaps due to a congenital abnormality related to having a single umbilical artery (instead of two). Id. at 18–43. Dr. Callery also stated that he disagreed with Dr. Dias' testimony regarding the timing of J.W.'s injuries. Id. at 28. In Dr. Callery's opinion, the timing of symptoms does not necessarily correspond with the timing of the injury itself. Id. Dr. Callery stated that the radiology report from the January 27 CT scan from Gettysburg Hospital referred to calcification and atrophy of the brain, conditions that could not have resulted from shaking or other trauma suffered on that day. Id. at 18. In addition, Dr. Callery noted that the radiology reports from the January 28 CT scan and MRI from Hershey Medical Center showed mixed ages of blood, both acute and chronic, suggesting that the trauma could have occurred more than 72 hours prior to the taking of the images. Id. at 27. Finally, Dr. Callery stated that "shaken baby" syndrome is a controversial and evolving diagnosis, that that some of its "hallmark" symptoms, including retinal hemorrhaging, had not been detected in this case. Id. at 31, 34.

On cross-examination, Dr. Callery acknowledged that retinal hemorrhaging does not occur in approximately 20% of shaken baby cases. Id. at 77. Dr. Callery also agreed that normally he would give greater weight to the conclusions of a radiologist from Children's Hospital of Philadelphia, such as Dr. Zimmerman, than to a radiologist from a community hospital like Gettysburg Hospital. Id. at 59. Upon review while on the stand, Dr. Callery agreed that Dr. Zimmerman's written report did not reference any chronic bleeding, atrophy or calcification in J.W.'s brain, either in connection with the January 27 or

28 CT scans and the January 28 MRI. *Id.* at 63. The Commonwealth also showed Dr. Callery a report by Detective Frank Donnelly (reportedly provided to trial counsel before the first trial), detailing an interview with Dr. Jones, the author of the January 27 radiology report relied upon by Dr. Callery. *Id.* at 68. According to the detective's report, Dr. Jones advised that an MRI is a better diagnostic tool and that the January 28 CT and MRI reflect subdural hematomas on both sides of J.W.'s brain, and not atrophy. *Id.* at 68–76. Dr. Jones also advised the detective that he had only very limited experience in shaken baby cases. *Id.* at 70.

Finally, Dr. Callery indicated that portions of his testimony at the dependency hearing in 2005 were incorrect, and that he would have so testified during cross-examination at trial.

Q. In that testimony you said rather than having two arteries with oxygenated blood feeding the growing fetus within the womb there is only one artery with oxygenated blood?

A. That's obviously a mistake, isn't it? What you have here—

Q. Sir, I haven't asked a question.

A. It's a mistake.

Q. You were mistaken when you testified on May 26, 2005 as to which artery or vein the umbilical artery or umbilical vein carried the oxygenated blood; isn't that correct?

A. Could you say that again?

Q. Yes. On [May] 26, 2005 you were mistaken as to whether the umbilical artery or the umbilical vein carries the oxygenated blood to the womb; isn't that true?

A. Yes. That was a mistake, yes.

\* \* \*

Q. Did you have discussions with [trial counsel] concerning this issue whether the vein or the artery carries the oxygenated blood?

A. Yes, he asked me about this.

Q. Is that when you learned you made a mistaken when you testified back in [May] of 2005?

A. Yes. I learned that I misspoke at that time, yes.

\* \* \*

Q. Doctor, when you would have testified before the jury if you were called on cross-examination I would have asked you about this issue and you would have admitted in front of that jury that you were wrong concerning your prior testimony; isn't that true?

A. Yes, I would have.

*Id.* at 47–48, 51, 53.

By order dated March 7, 2013, the PCRA court dismissed Wantz's PCRA petition. This timely appeal followed, in which Wantz raises the following four issues for our review and determination:

1. Did the PCRA court err in failing to grant a new trial on the grounds of ineffective assistance of counsel as against the weight of the evidence[?]

2. Did the [PCRA] court abuse its discretion or commit an error of law by not finding that [Wantz] was prejudiced by trial counsel's failure to call an expert medical witness when counsel knew of his testimony coupled with the necessity to offer an alternative theory or to cast doubt on the Commonwealth's testifying expert medical witness[?]

3. Did the [PCRA] court abuse its discretion or commit an error of law by admitting and considering hearsay evidence of a non-witness's report of hearsay evidence from a prior mistrial in violation of [Wantz's] constitutional rights[?]

4. Did the [PCRA] court abuse its discretion or commit an error of law by admitting and considering hearsay evidence of a non-witness's report of hearsay evidence never admitted in [Wantz's] criminal trial in violation of [Wantz's] constitutional rights[?]

Wantz's Brief at 3.

Wantz's first two issues on appeal challenge the PCRA court's decision to dismiss his ineffective assistance of counsel claim on the grounds that he did not suffer prejudice as a result of trial counsel's failure to call Dr. Callery to testify at his second jury trial. To this end, Wantz offers two arguments. First, Wantz contends that the PCRA court applied the wrong legal standard for a finding of prejudice on an ineffectiveness claim for failing to call a witness to testify. *Id.* at 11–16. In this regard, Wantz directs our attention to a recent *en banc* decision of this Court, *Commonwealth v. Matias,* 63 A.3d 807 (Pa.Super.2013) (*en banc* ). Wantz's Brief at 14–16. Second, Wantz argues that upon application of the proper legal standard, the PCRA court's finding of a lack of prejudice was in error, as Wantz met his burden of proof by a preponderance of the evidence to show that Dr. Callery's testimony would have been beneficial and helpful to his defense. *Id.* at 16–23.

Our standard of review of an order denying PCRA relief is whether the record supports the PCRA court's findings of fact, and whether the PCRA court's determination is free of legal error. *Commonwealth v. Phillips,* 31 A.3d 317, 319 (Pa.Super.2011) (citing *Commonwealth v. Berry,* 877 A.2d 479, 482 (Pa.Super.2005)), *appeal denied,* 615 Pa. 784, 42 A.3d 1059 (2012). A PCRA petitioner must establish the claim by a preponderance of the evidence. *Commonwealth v. Gibson,* 592 Pa. 411, 415, 925 A.2d 167, 169 (2007).

The essence of a claim of ineffective assistance of counsel is that counsel's un-professional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. *Commonwealth v. Collins,* 585 Pa. 45, 59, 888 A.2d 564, 572 (2005). As originally established by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error. *See, e.g., Commonwealth v. Natividad,* 595 Pa. 188, 207, 938 A.2d 310, 321 (2007); *Commonwealth v. Steele,* 599 Pa. 341, 961 A.2d 786, 796 (2008); *Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945, 954 (2008); *Commonwealth v. Franklin,* 990 A.2d 795, 797 (Pa.Super.2010).

To satisfy the prejudice prong of this test when raising a claim of ineffectiveness for the failure to call a potential witness at trial, our Supreme Court has instructed that the PCRA petitioner must establish that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew, or should have known, of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Sneed,* 616 Pa. 1, 22–23, 45 A.3d 1096, 1108–09 (2012) (citing *Commonwealth v. Johnson,* 600 Pa. 329, 351, 966 A.2d 523, 536 (2009) and *Commonwealth v. Clark,* 599 Pa. 204, 222, 961 A.2d 80, 90 (2008)).

In this case, the PCRA court concluded that Wantz had satisfied the first two factors of the *Strickland* test and the first four factors of the *Sneed* test:

Here, there is no dispute that Dr. Callery existed and that trial counsel knew of his existence. [Wantz] has also established by a preponderance of the evidence that Dr. Callery was willing to testify. He may have been reluctant to testify, but even counsel acknowledges that Dr. Callery never refused to testify. On the surface, it would appear that there is arguable merit to the claim that the failure to present the testimony of Dr. Callery at the re-trial constituted ineffective assistance of counsel. Trial counsel was aware that the Commonwealth would present the testimony of Dr. Dias as to the cause and timing of [J.W.'s] injury. The use of Dr. Callery's expert testimony to challenge both the causation and timing of the injury would be a reasonable trial strategy and one minimally expected of counsel in defense of a criminal defendant. This is especially so where, as here, other persons, such as the child's mother had access to the child at other times, including earlier on January 27.

Likewise, there does not appear to be an objective reasonable basis on the part of trial counsel not to present Dr. Callery as a defense witness at the retrial. Although Dr. Callery may have been reluctant to testify, counsel apparently did not explore which of Dr. Callery's conclusions was incorrect and whether those errors would have been harmful to the defense. Instead, by his own admission, he dismissed the only expert available who might challenge Dr. Dias' testimony.

Trial Court Opinion, 3/7/2013, at 16–17.

The PCRA court concluded, however, that Wantz has not established that trial counsel's ineffectiveness resulted in sufficient prejudice to compel PCRA relief.

Unfortunately for [Wantz], more is required to obtain PCRA relief. This [c]ourt does not believe [Wantz] has established that he was prejudiced, as that term is used in the context of a PCRA proceeding. Here, as in many cases, the prejudice prong is the most difficult to establish. It requires the court to conclude that the outcome of the trial would probably have been different if the testimony had been presented. A court must engage in this exercise without knowing precisely how counsel would have examined the witness, how the witness would have responded to cross-examination, and how the witness' credibility would have been evaluated by the jury. In this case, Dr. Callery did not dispute that [J.W.] had been injured but rather urged caution in calculating the timing of the injury based upon certain symptoms. However, when one examines Dr. Callery's concerns against the evidence presented by the Commonwealth, the likelihood of a different outcome in the trial is negated.

*Id.* at 17.

■ Wantz first argues that the PCRA court applied the wrong legal standard for prejudice when it conducted a "hypothetical trial" to determine whether the introduction of Dr. Callery's testimony would have created a reasonable probability of a different result at the second jury trial. In particular, Wantz focuses on the following language from our Supreme Court's decision in *Sneed:*

To demonstrate *Strickland* prejudice, a petitioner 'must show how the uncalled witnesses' testimony would have been **beneficial under the circumstances of the case.'** *Commonwealth v. Gibson,*

597 Pa. 402, 951 A.2d 1110, 1134 (2008). Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been *helpful to the defense. Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1319 (1996).

*Sneed*, 616 Pa. at 23, 45 A.3d at 1109 (emphasis added). According to Wantz, when the ineffectiveness claim is based upon the failure to call a witness, the burden on the petitioner is only to show that the missing testimony would have been "beneficial under the circumstances of the case" and "helpful to the defense." Wantz's Brief at 13. In its attempt to determine whether Dr. Callery's testimony might have reasonably resulted in a different verdict, Wantz argues that the PCRA court improperly "elevated the requirement for ineffectiveness of counsel where counsel failed to present a witness." *Id.* at 17.

We disagree, as we do not conclude that either *Sneed* or the cases cited therein (including *Gibson* and *Auker*) establish a different legal standard for prejudice in the context of a missing witness claim (as opposed to any other ineffectiveness claim). Whether an uncalled witness's testimony would have been "beneficial" or "helpful" to the defense depends ultimately upon whether it would have created a reasonable probability of a different outcome at trial. In turn, when an uncalled witness's testimony would have created a reasonable probability of a different outcome trial, "the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial." *Sneed*, 616 Pa. at 23, 45 A.3d at 1109. In our view, the *Sneed* Court's use of the terms "beneficial" and "helpful" was intended merely to be explanatory of the application of the *Strickland* prejudice requirement in the specific context of a missing witness

claim, and not intended to create a new (lesser) legal standard in the such situations.

In this regard, we note that in *Gibson*, after indicating that the petitioner had to show how the uncalled witnesses' testimony was "beneficial under the circumstances of the case," the Supreme Court engaged in precisely the sort of "hypothetical trial" as did the PCRA court in this case:

[N]one of the evidence of Green's possible involvement in the murders proffered by Appellant in his PCRA petition directly contradicts the Commonwealth's presentation at trial. Significantly, the fact that Tancemore and Green had previously committed robberies together, even if accepted as true, does not imply that Appellant was not involved on this occasion, particularly as another proposed witness would have testified that Appellant left in the company of both Tancemore and Green, and Appellant himself admitted that he had been at the bar on the night of the murders. Similarly, the statement of a witness indicating that he did not see Appellant shooting at the bar does not demonstrate that Appellant did not fire a weapon; rather, in the absence of any indication that the witness's view of Appellant was uninterrupted, it simply reflects that the witness did not make such an observation. In addition, as both the Commonwealth and the PCRA court noted, the testimony of the witnesses could have been impeached with their prior convictions for several robberies, a *crimen falsi* offense. Thus, considering the evidence presented at trial, including Appellant's statement to the detectives admitting participation in the murders and the testimony of several eyewitnesses positively identifying Appellant as one of the perpetrators, we conclude that the PCRA court did not err in dismissing

this claim, despite the evidentiary proffer.

*Gibson,* 597 Pa. at 442–43, 951 A.2d at 1134 (citations omitted). This analysis contains the same considerations as are at issue here, including the impact of potential cross-examination of the uncalled witnesses and a proposed rebuttal witness.

This Court's recent *en banc* decision in *Matias* does not compel a different conclusion. Matias was convicted of committing sexual assaults against "R.," a thirteen-year-old girl, based upon her testimony that he had done so on two occasions in the basement of his home. *Matias,* 63 A.3d at 809. Trial counsel for Matias failed to call Matias' eight-year-old daughter, "K.," who would have testified that she was present in the basement on one such occasion and that no sexual assault on R. occurred. *Id.* at 811. K's testimony would have directly contradicted R's testimony, who claimed that K. sat on the couch in the basement while Matias assaulted her the first time. *Id.* Trial counsel declined to interview or call K. as a witness because of her age and a concern that the jury might react negatively to Matias calling his young daughter to testify. *Id.* at 812. The PCRA court ruled that trial counsel's failure to call K. to testify constituted ineffective assistance of counsel and this Court affirmed, concluding that "the absence of K.'s testimony was so prejudicial as to deny Matias a fair trial." *Id.*

In *Matias,* this Court did not apply a new or lesser legal standard for a finding of prejudice when considering a missing witness ineffectiveness claim. To the contrary, the testimony of the witness that trial counsel failed to call could well have produced a different outcome at trial. The case pitted the word of one witness (R.) over that of the defendant (Matias). This Court agreed with the PCRA court that

the testimony of another person (K.), who R. agreed was in the basement when one of the alleged assaults occurred, might well have tipped the balance in Matias' favor (particularly given the Commonwealth's burden to prove R.'s allegations beyond a reasonable doubt). Because we concluded that trial counsel's error resulted in a reasonable probability of a different result at trial, we ruled that said error was clearly prejudicial. *Id.*

Having determined that the PCRA court in this case did not apply the wrong legal standard, we likewise agree that the PCRA court did not abuse its discretion in the application of the legal standard for prejudice. In finding that the failure to call Dr. Callery as a witness at the second jury trial would not have resulted in a reasonable probability of a different outcome, the PCRA court stated as follows:

First, Dr. Callery suggested that the January 27 CT scan evidenced calcification and atrophy in [J.W.'s] brain. He contended that this was proof of a chronic lack of oxygenated blood getting to the brain and that these features could have impacted the child's central nervous system, causing the breathing and seizures observed on January 27th and thereafter. Dr. Callery acknowledged in the dependency proceeding that the birth abnormality, to the extent it existed, could not have caused the subdural bleeding found in [J.W.'s] brain. Dr. Dias has testified that he was not aware of any case of placental abnormality that caused the type of trauma suffered by [J.W.] four weeks after birth. Dr. Callery also admitted that he is not trained to read and interpret CT scans and, therefore, he would yield to the findings of a trained radiologist. Therefore, if the initial reading from Gettysburg Hospital lacked credence then his conclusions would also be

suspect. Dr. Zimmerman has the expertise that Dr. Callery lacks and he concluded that the CT scan did not show the calcification and atrophy initially reported by Dr. Jones. In fact, Dr. Zimmerman had previously confirmed that later scans evidenced brain cells dying due to trauma inflicted within the January 27th time frame. Furthermore, at the first trial, the Commonwealth was also prepared to call Dr. Jones to dispute his factual finding.[1]

Second, Dr. Callery noted that there are some hallmarks of non-accidental trauma related to shaking which were not present in this case. For example, he reported that portions of the retina will break off due to shaking. However, he acknowledged that such damage does not occur in approximately 20% of the cases. He further noted that finger impressions are sometimes seen on a child's rib cage. However, in the juvenile dependency proceeding there was indication by the first responder to the home that there was a 'bright red color extending from the child's clavicle to his sternum.'

Certainly, any doubt as to the timing of the injury could benefit [Wantz] due to the child's exposure to others who could have shaken him. However, [Wantz's] actions and statements prior to trial, if believed by a jury, eliminated that possible explanation. For reasons never explained by [Wantz], he left [J.W.] alone at Gettysburg Hospital on January 27th, knowing that the child was to be flown to Hershey Medical Center. He obviously had to know that there were serious concerns about his infant son for that procedure to be pursued. Nevertheless, [Wantz] drove home, led his wife to believe that there were minimal concerns, and did not go to Hershey until the following day. Four days later, and 14 months before criminal charges were filed, [Wantz] told a caseworker and police officer 'I'll say I did it. I don't care about jail ...' Then, 11 months later, and 16 days after the Juvenile Court adjudicated [J.W.] to be a dependent child, [Wantz] submitted a written note to the police that stated, '... I did bodily harm to [J.W.] ... [J.W.] kept crying I shook him & threw him down in his crib ... I can't live with what I done.' When one compares the expert and thorough testimony of Dr. Dias, the potential testimony of Drs. Zimmerman and Jones, and [Wantz's] verbal and written admissions with the limited and theoretical testimony of Dr. Callery, it is difficult to conclude that the truth-determining process was undermined and that there is a reasonable probability that the outcome of the trial could have been different.

---

1 [Wantz] contends that this [c]ourt should not consider the potential testimony of Dr. Zimmerman and Dr. Jones because they were not called as witnesses by the Commonwealth during the re-trial. I disagree. Dr. Zimmerman testified at the dependency proceeding and during the first trial. Dr. Jones was subpoenaed to testify at the first trial. At the time of the first trial the Commonwealth expected Dr. Callery to testify on behalf of [Wantz] and had these witnesses available to counter Dr. Callery's expected testimony. When the Commonwealth was advised that Dr. Callery would not be called by the defense during the re-trial there was no longer the same need to counter that testimony. Therefore, the Commonwealth made a strategic decision not to call those medical professionals. Had Dr. Callery testified during the re-trial it is reasonable to conclude that the Commonwealth would have presented the testimony of Drs. Zimmerman and Jones. Under those circumstances it would disingenuous to suggest that their testimony cannot be considered in determining whether [Wantz] was prejudiced by trial counsel's failure to call Dr. Callery as a witness.

Trial Court Opinion, 3/7/2013, at 18–20 (some footnotes omitted).

We cannot agree with Wantz that the PCRA court's analysis of the lack of preju-

dice was against the weight of the evidence. If he had testified, Dr. Callery would have had to admit that a good deal of his prior testimony regarding the causes of J.W.'s injuries was incorrect based upon his confusion regarding the functions of the placental arteries and veins carrying blood to the womb. N.T., 3/9/2012, at 47–48. To the extent that Dr. Callery could have continued to attempt to attribute J.W.'s injuries, in whole or in part, to congenital abnormalities, he would have had to acknowledge that this opinion was based upon Dr. Jones' January 27 radiology report—and the Commonwealth would have countered with Dr. Zimmerman's contrary analysis of the CR scans and MRI results. Dr. Jones had also been subpoenaed to testify, and would likely have supported Dr. Zimmerman's analysis. Dr. Callery admitted that he would have given greater weight to the conclusions of Dr. Zimmerman than to those of Dr. Jones. Dr. Zimmerman insisted that J.W. had subdural bleeding around his brain, a condition that Dr. Callery agreed could not be explained by congenital abnormalities. Finally, while Dr. Callery continued to disagree with Dr. Dias' opinion regarding the timing of J.W.'s injuries, the jury would likely have considered this opinion by Dr. Callery within the context of his admission of prior mistakes in his testimony as well as Wantz's admissions of wrongdoing.

For these reasons, we conclude that the PCRA court did not abuse its discretion or commit an error of law in dismissing Wantz's PCRA petition based upon a lack of prejudice.

 For his third and fourth issues on appeal, Wantz argues that the PCRA court erred in relying upon inadmissible hearsay evidence at the evidentiary hearing. Wantz contends that the PCRA court erred in permitting the Commonwealth to introduce, during the cross-examination of Dr. Callery, a detective's report containing notes of an interview with Dr. Jones as well as Dr. Zimmerman's radiological report. According to Wantz, both of these documents were hearsay (or double hearsay), and their introduction without requiring testimony from Drs. Jones and Zimmerman violated his federal and state constitutional rights to confront witnesses against him. U.S. CONST. amend. VI; PA. CONST. art. I, § 9.

Our standard of review relative to the admission of evidence is for an abuse of discretion. *Commonwealth v. Feliciano,* 67 A.3d 19, 27 (Pa.Super.2013). The admissibility of hearsay is addressed in Rules 801, 802, and 803 of the Pennsylvania Rules of Evidence. Rule 801(c) defines hearsay as "a statement . . . offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). Hearsay evidence is inadmissible under Rule 802. Out of court statements are not inadmissible hearsay, however, if they are offered for some relevant purpose other than to prove the truth of the matter asserted. *Commonwealth v. Ali,* 608 Pa. 71, 126, 10 A.3d 282, 315 (2010); *Commonwealth v. Puksar,* 559 Pa. 358, 368, 740 A.2d 219, 225 (1999).

A review of the transcript of the PCRA evidentiary hearing shows that the PCRA court admitted both the detective's report and Dr. Zimmerman's report not for the truth of the matters set forth therein, but rather for the purpose of establishing counsel's strategic basis for not calling Dr. Callery to testify and the lack of prejudice resulting from the decision not to do so. With respect to the detective's report, for example, the PCRA court stated, "I understand that admission of that exhibit is not based upon the truth of what was stated in there but I thought it was presented to show that some information was known or made available that may have impacted strategy." N.T., 3/9/2012, at 154. Because counsel's strategic basis for not call-

ing Dr. Callery and the lack of prejudice resulting therefrom were clearly relevant issues during the PCRA proceedings, and because these exhibits were admitted for these purposes, the PCRA court did not abuse its discretion in this regard.

The Confrontation Clause in the Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.[6] In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court ruled that where the prosecution presents testimonial hearsay, the only *indicium* of reliability sufficient to satisfy the Sixth Amendment and permit the admission of the hearsay is "confrontation." *Id.* at 68–69, 124 S.Ct. 1354.

According to our Supreme Court, "[a]t its most basic level, the Sixth Amendment's Confrontation Clause seeks to ensure that the trial is fair and reliable by preserving an accused's right to cross-examine and confront the witnesses against him." *Commonwealth v. Collins,* 585 Pa. 45, 64, 888 A.2d 564, 575 (2005). The focus of claims of violation of this constitutional right is on the fairness and reliability of the criminal defendant's *trial.* Wantz has cited to no authority holding that a Confrontation Clause challenge may be asserted in non-trial proceedings, including during PCRA evidentiary hearings. *See, e.g., United States v. Stone,* 432 F.3d 651, 654 (6th Cir.2005) (because *Crawford* focused only on testimonial evidence at trial, "it does not change our long-settled rule that

the Confrontation Clause does not apply in sentencing hearings"), *cert. denied,* 549 U.S. 821, 127 S.Ct. 129, 166 L.Ed.2d 35 (2006). To the contrary, on at least two occasions our Supreme Court has held that Confrontation Clause issues may not be asserted in collateral proceedings. *See Commonwealth v. Collins,* 585 Pa. 45, 65 n. 15, 888 A.2d 564, 576 n. 15 (2005) ("*Crawford,* however, is unavailable to claimants on collateral review. . . ."); *Commonwealth v. Gribble,* 580 Pa. 647, 663 n. 7, 863 A.2d 455, 464 n. 7 (2004) ("We need not concern ourselves with that question, as this is a collateral attack, and *Crawford* does not apply.").

Accordingly, Wantz's third and fourth issues on appeal lack any merit and no relief is due.

Order affirmed.

---

**6.** The Confrontation Clause in Article 1, Section 9 of the Pennsylvania Constitution reads in relevant part as follows: "In all criminal prosecutions the accused hath a right . . . to be confronted with the witnesses against him. . . ." PA. CONST. art. I, § 9. Pennsylvania's Confrontation Clause provides a criminal defendant with the same protection as the Sixth

Amendment, and thus we address both challenges simultaneously. *See Commonwealth v. Atkinson,* 987 A.2d 743, 745 (Pa.Super.2009), *appeal denied,* 608 Pa. 614, 8 A.3d 340 (2010); *Commonwealth v. Geiger,* 944 A.2d 85, 97 n. 6 (Pa.Super.2008), *appeal denied,* 600 Pa. 738, 964 A.2d 1 (2009).