J-A09027-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| SEAN BURTON, | : | |
| | : | |
| Appellant | : | No. 1861 EDA 2014 |

Appeal from the PCRA Order May 30, 2014,
Court of Common Pleas, Delaware County,
Criminal Division at No. CP-23-CR-0003894-2010

BEFORE:  BOWES, DONOHUE and STABILE, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED MAY 05, 2015**

Appellant, Sean Burton ("Burton"), appeals from the order entered on May 30, 2014 by the Court of Common Pleas, Delaware County, denying his petition for relief pursuant to the Post-Conviction Relief Act ("PCRA").[1]  For the reasons set forth herein, we conclude that Burton did not satisfy the requisite elements of a claim for ineffective assistance of counsel, and we therefore affirm the PCRA court's order.

A prior panel of this Court provided the following summary of the facts and procedural history:

> This case arises out of the relationships between Burton, Theresa Murphy [("Murphy")], and the victim, Army Sergeant James Stropas [("Stropas")].
>
> Burton was the owner of Final Impact, a car stereo and alarm shop in Morton, Pennsylvania, when he

---

[1]  42 Pa.C.S.A. §§ 9541-46.

met Murphy in 2005. He was divorced, and she was the single mother of two children. Burton and Murphy married on July 6, 2006, and lived as a couple in Pennsylvania, although Burton maintained a residence in Delaware where he would stay for extended periods of time. In 2006, before the marriage, Murphy met Stropas, who was a security guard in the building where Murphy worked. In early 2008, Burton and Murphy separated, and Murphy filed for divorce. She was not represented by counsel, and did not seek spousal support or equitable distribution of marital property. The divorce became final on June 10, 2008.

During the separation, and prior to the divorce, Burton lived in his residence in Delaware. In February 2008, Stropas stayed with Murphy in Springfield, Pennsylvania. On one occasion, Burton came to the house and noticed Stropas' Jeep in the driveway. When he entered the house, he went into the master bedroom where he saw Stropas on the bed wearing shorts and a tank top. Burton was upset, but no altercation occurred.

After the separation and divorce, Burton and Murphy remarried each other in November 2008. In March 2009, Stropas began his second tour of duty in Iraq, during which time he and Murphy remained in contact. Upon his return from Iraq in March 2010, Stropas met with Murphy. Shortly thereafter, Stropas went on a road trip by himself, and returned to the area in May 2010.

During Memorial Day weekend 2010, Burton and Murphy had a disagreement during which Burton admitted to infidelity, and the couple discussed divorce. Burton left the house, and Murphy contacted Stropas, who began living with her shortly thereafter.

On June 9, 2010, Murphy, now represented by counsel, filed for divorce, and sought spousal support and division of marital property. Upon receiving the

complaint, Burton attempted to reconcile because he did not want to have to pay support. When Burton's first marriage ended in 1998, he was ordered to pay his ex-wife four years of alimony. He did not wish to have a similar situation with Murphy.

At the same time that Murphy was living with Stropas, she and Burton attended marriage counseling sessions and maintained an intimate relationship.

Sunday, June 20, 2010, was Fathers' Day. Murphy invited Stropas to spend the day with her and her two children. Burton knew that he was not invited. In the early morning hours of June 20, 2010, Burton went to Murphy's house and attached a GPS device to Stropas' Jeep, which was parked in the driveway. The GPS unit transmitted information regarding the location of the vehicle to Burton's cellular phone and laptop so he would be able to find out the location of the Jeep at all times.

On the morning of Monday, June 21, 2010, Burton drove his van to work. He and Murphy texted about a marriage counseling session scheduled for that afternoon. That morning, Murphy and Stropas planned to go to a doctor's appointment, and because they were running late, Murphy asked him to drive to the Dunkin' Donuts at the Olde Sproul Shopping Center to pick up some coffee for her.

Burton was at his office at Final Impact when he received an alert that Stropas' Jeep had moved. He left work and drove to the Bertucci's restaurant parking lot close to Murphy's house. From the parking lot he could see Stropas' Jeep driving toward him. While receiving updates from the GPS, Burton followed Stropas' Jeep to the Olde Sproul Shopping Center where he saw Stropas enter the Dunkin' Donuts. Burton parked his van close to Stropas' Jeep, and then removed his Final Impact tee shirt, turned it inside out, and put it back on.

Stropas exited the Dunkin' Donuts with two cups of coffee and a bag of food. He opened the driver's side door of the Jeep and entered the vehicle. According to Burton, he approached Stropas, who acknowledged his presence by saying, "Hey Sean." Burton then alleged that Stropas grabbed a knife and began to attack him. Once Burton was able to get the knife blade from Stropas, he stabbed and slashed him more than seventy times. After the attack was over, Burton got into the Jeep, sat down on top of Stropas, whose body was stretched across the front seat, and drove out of the shopping center. Police pulled him over shortly thereafter, and as he exited the Jeep at the officers' command, he stated, "He came at me with a knife and I had to defend myself." Burton was taken to the hospital where he was treated in the emergency room. Stropas died as a result of his wounds.

A search of Burton's van that he drove to the scene of the crime revealed a hand truck, heavy duty rubber gloves, duct tape, electrical tape, plastic "zip ties," a shovel, a hatchet, a can of gasoline, and a baseball bat.

On June 21, 2010, police charged Burton with several offenses arising out of Stropas' death.

A jury trial began on March 21, 2011. Burton testified in his own defense. He told the jury that when he approached the Jeep, Stropas was seated inside, and the driver's side door was open. Burton intended to close the door so that he would be standing outside while Stropas remained inside. However, he did not get to close the door because he saw Stropas turn around with a knife in his hand. Burton grabbed the knife blade with his right hand and then grabbed his right hand with his left hand as his body was pinned up against the driver's side doorframe. Burton twisted the blade and it snapped, leaving the blade in his hand and the handle in Stropas' hand. Stropas started to move towards Burton, and Burton stabbed Stropas in the chest. He

proceeded to stab and slash him while pushing Stropas back onto the seat. Stropas lunged over to the passenger side, and Burton thought he was reaching underneath the passenger seat for another weapon, so Burton yelled for help twice and stabbed Stropas in the back. Stropas was reaching for the passenger door handle, which led Burton to believe that Stropas was going to get out of the vehicle and try to kill him. Burton then stabbed Stropas in the neck. After Burton saw Stropas' face, he dropped the knife and held Stropas' neck to stop the bleeding. He then got behind the wheel of the Jeep with the intention of driving Stropas to the hospital. N.T. Trial, 3/24/11, at 84-93.

The jury also heard the testimony of Dr. Bennett Preston, the medical examiner who performed the autopsy on Stropas. He testified that Stropas was slashed and stabbed seventy to eighty times, and that he sustained classic defense wounds. When Dr. Preston was shown photographs of the injuries that Burton sustained to his hands, he testified that they were not defense wounds, but were caused by Burton's hands slipping on the knife. N.T. Trial, 3/23/11, at 27, 41-42, 53.

On March 25, 2011, the jury convicted Burton of first-degree murder and PIC. On May 24, 2011, the court sentenced Burton to life imprisonment for first-degree murder and a consecutive term of six to twenty-three months for PIC.

Burton filed a notice of appeal on June 15, 2011, and on July 7, 2011, he filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court filed its Rule 1925(a) opinion on August 12, 2011.

*Commonwealth v. Burton*, 1582 EDA 2011, at 1-6 (Pa. Super. March 28, 2012) (unpublished memorandum).

On March 28, 2012, a panel of this Court affirmed the judgment of sentence. On April 20, 2012, Burton filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which was denied on August 28, 2012. Burton subsequently filed a timely PCRA petition on April 3, 2013.

On June 3, 2013, the PCRA court filed a Notice of Intent to Dismiss PCRA Petition Without a Hearing pursuant to Rule 907 of the Pennsylvania Rules of Criminal Procedure. Burton filed a response on June 11, 2013 and an amended PCRA petition on October 15, 2013. On February 27, 2014, the PCRA court held an evidentiary hearing on Burton's amended PCRA petition. At the conclusion of the evidentiary hearing, the PCRA court issued an order, permitting Burton to file a memorandum of law in support of his arguments by April 14, 2014 and permitting the Commonwealth to file a memorandum of law in support of its arguments by April 28, 2014. On May 30, 2014, after considering all of the evidence, the PCRA court denied Burton's PCRA petition.

Burton filed a timely notice of appeal on June 20, 2014 and a statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure on July 3, 2014. On appeal, Burton raises the following issues for our review:

> 1. Did the PCRA court err in denying [Burton] a new trial due to ineffective assistance of trial counsel?

A. Was trial counsel ineffective in failing to present an expert witness regarding the use of the GPS locator device in this case?

B. Was trial counsel ineffective in failing to object to prosecutorial misconduct during the prosecutor's closing speech to the jury?

2. Was trial counsel ineffective in failing to object to the prosecutor's closing remark that, "It's not the first time [Burton]'s gone after somebody with a knife"?

3. Was trial counsel ineffective in failing to pursue a motion in limine regarding the defense testimony offered by Detective Frey which referred to [Burton], upon arrest, having asked to "talk to a lawyer"?

Burton's Brief at 3.

Our standard of review of an order denying PCRA relief is whether the record supports the PCRA court's findings of fact, and whether the PCRA court's determination is free of legal error. *Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa. Super. 2014) (citing *Commonwealth v. Phillips*, 31 A.3d 317, 319 (Pa. Super. 2011)). A PCRA petitioner must establish the claim by a preponderance of the evidence. *Commonwealth v. Gibson*, 925 A.2d 167, 169 (Pa. 2007).

In his brief, Burton presents several arguments that trial counsel, Attorney Mark Much ("Attorney Much"), provided ineffective assistance. "Our longstanding test for ineffective assistance of counsel derives from the standard set by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Commonwealth v. Clark*, 961 A.2d

80, 85 (Pa. 2008). The test for ineffective assistance of counsel (the "IAC test") requires the petitioner to establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Commonwealth v. Lippert*, 85 A.3d 1095, 1100 (Pa. Super. 2014). "Failure to meet any prong of the test will defeat an ineffectiveness claim." *Commonwealth v. Michaud*, 70 A.3d 862, 867 (Pa. Super. 2013) (quoting *Commonwealth v. Wright*, 961 A.2d 119, 148-49 (Pa. 2008)).

Beginning with his first issue on appeal, Burton argues that Attorney Much failed to present an expert witness to contradict the Commonwealth's witness, Clark Swanson ("Swanson"), regarding Burton's use of the GPS locator device on Stropas' vehicle. Burton's Brief at 7. Burton contends that Swanson's testimony, which indicated that Burton manually initiated 147 GPS locate commands, "significantly contributed to the guilty verdict at trial." *Id.* at 8-9. The PCRA court determined that Attorney Much did not render ineffective assistance of counsel because the outcome of trial would not have been any different if Burton's proposed expert witness, Michael Caloyannides, Ph.D. ("Dr. Caloyannides"), had testified. PCRA Court Opinion, 8/11/14, at 26. After reviewing the record, we conclude that the record supports the PCRA court's conclusion.

This Court has established that when raising a claim for ineffectiveness for failing to call a potential witness at trial, the PCRA petitioner must satisfy the prejudice prong of the IAC test by establishing the following:

> (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew, or should have known, of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

***Wantz***, 84 A.3d at 331 (citing ***Commonwealth v. Sneed***, 45 A.3d 1096, 1108-09 (Pa. 2012)).

In this case, Burton failed to establish that Attorney Much's failure to call Dr. Caloyannides at trial was so prejudicial as to have denied him a fair trial. This Court has established that to demonstrate prejudice, "a petitioner 'must show how the uncalled witness[]' testimony would have been **beneficial under the circumstances of the case**.'" ***Wantz***, 84 A.3d at 332 (citing ***Gibson***, 951 A.2d at 1134) (emphasis in original).

> Whether an uncalled witness's testimony would have been "beneficial" or "helpful" to the defense depends ultimately upon whether it would have created a reasonable probability of a different outcome at trial. In turn, when an uncalled witness's testimony would have created a reasonable probability of a different outcome [at] trial, "the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial."

***Id***. at 333 (citing ***Sneed***, 45 A.3d at 1109).

At the PCRA hearing, Dr. Caloyannides testified that if called to testify at trial, he would have offered testimony that the GPS locate commands could have occurred without manual initiation. N.T., 2/27/14, at 23-25. Dr. Caloyannides further stated that he would have testified that no one could have said, with a reasonable degree of certainty, that the pattern that was observed occurred as a result of manual initiation. *Id.* at 38-39. Dr. Caloyannides also testified, however, that he did not examine the device used by Burton in this case, and only knew the functionality of the device based on the description provided by Swanson at trial. *Id.* at 30-31. Furthermore, Dr. Caloyannides testified that he would not have been able to determine which locate commands were automatic and which commands were manual. *Id.* at 40. Instead, Dr. Caloyannides stated that any determination he would have made regarding whether the locate commands were automatic or manual would have been by conjecture by "taking into consideration what's plausible." *Id.* at 41.

After our review of the record, we conclude that the record supports the PCRA court's conclusion that Dr. Caloyannides' testimony was not beneficial to Burton's defense in this case. Burton's defense was that he acted in self-defense. The issue of whether the GPS locate commands were automatic or manual was not beneficial or useful to proving that he acted in self-defense as Burton himself testified that he placed the GPS device on Stropas' car and manually tracked the location of Stropas' car on several

occasions, including on the day of the incident. *See* N.T., 3/24/11, at 112-14. Although Burton contested the number of times he manually tracked the location of the GPS device, it is questionable whether Dr. Caloyannides' testimony, which was admittedly based upon conjecture, could establish a lower number. Even if he could establish a lower number, however, Dr. Caloyannides' testimony would not have supported Burton's self-defense theory, as it had no bearing on whether or not he acted in self-defense. As a result, we conclude that the PCRA did not err in reaching its conclusion that Dr. Caloyannides' testimony would not have affected the outcome of the trial. Burton therefore failed to establish any prejudice, and consequently, failed to satisfy the third prong of the IAC test. The PCRA court did not err in its determination the Attorney Much did not render ineffective assistance of counsel for failing to call Dr. Caloyannides to testify.

For his next two issues on appeal, Burton alleges that Attorney Much provided ineffective assistance by failing to object to two instances of prosecutorial misconduct, both of which occurred during the Commonwealth's closing argument. The first involves the prosecutor's statement to the jury regarding Burton's credibility. Burton argues that it was unfair and improper for the prosecutor to state, "we saw his performance yesterday. I suggest to you that his testimony, that his -- that the Appellant himself, as well as his story, are completely incredible." Burton's Brief at 17 (citing N.T., 3/25/11, at 97). Burton asserts that

Attorney Much "was under an obligation to present an objection" and his failure to do so, denied Burton of a fair trial. **Id.** at 18.

Attorney Much testified at the PCRA hearing regarding his justification for not lodging an objection to the prosecutor's comment, stating:

> I had tried to argue that [Burton's] testimony was consistent not only with, you know, other witnesses in the case, but with, you know, other evidence in the case. And I thought it was a fair response to my argument.
>
> … I listen when prosecutors close and I object in prosecutor's closing, not all the time, but frequently enough to say that I do object. And I listen for the words, I believe, I heard suggest, I submit, I suggest. It's argument. It's either the jury found him credible or not credible. And at the time, I just didn't feel that it was that important to object.

N.T., 2/27/14, at 79, 81.

The PCRA court determined that Attorney Much did not provide ineffective assistance by failing to object, finding that "[t]he prosecutor's statements were grounded in findings supported by the record, **not her own personal judgment**." PCRA Court Opinion, 8/11/14, at 30 (emphasis in original). After our review of the record, we agree.

This Court has established that "[a]lthough a prosecutor may comment on the credibility of the defendant or other witnesses, it is improper for a prosecutor to express a personal belief as to their credibility." **Commonwealth v. Sanchez**, 82 A.3d 943, 981 (Pa. 2013) (citing **Commonwealth v. Chmiel**, 889 A.2d 501, 545 (Pa. 2005)). It is well

settled, however, that "[a] prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor." ***Commonwealth v. Charleston***, 94 A.3d 1012, 1024 (Pa. Super. 2014) (quoting ***Commonwealth v. Rolan***, 964 A.2d 398, 410 (Pa. Super. 2008)). Furthermore, "[i]n cases where the outcome is controlled by credibility determinations, a prosecutor is permitted to make comments reinforcing the fact that the jury is presented with conflicting accounts. A prosecutor's contention that a defendant lied is neither unfair nor prejudicial when the outcome of the case is controlled by credibility[.]" ***Commonwealth v. Judy***, 978 A.2d 1015, 1024 (Pa. Super. 2009) (citing ***Commonwealth v. Johnson***, 588 A.2d 1303, 1307 (Pa. 1991)). "[I]n reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made." ***Judy***, 978 A.2d at 1019 (quoting ***Commonwealth v. Sampson***, 900 A.2d 887, 890 (Pa. Super. 2006)).

In this case, the record reflects that Attorney Much used his closing statement to connect statements and evidence produced at trial with his theory that Burton acted in self-defense. ***See*** N.T., 3/25/11, at 7-79. Attorney Much testified at the PCRA hearing that part of his goal for delivering his closing statement was to convince the jury that Burton was credible. N.T., 2/27/14, at 78. In so doing, Attorney Much emphasized that

the evidence presented at trial, including the injuries Burton sustained, were consistent with Burton's story, and stated on several occasions that Burton offered consistent and unequivocal testimony at trial. *Id.* at 45-46, 64.

During her closing statement, the prosecutor attempted to establish the contrary to be true, averring that the evidence supported the Commonwealth's theory that Stropas' murder was premeditated rather than Burton's self-defense theory. The prosecutor made the statement that Burton's story was incredible in the midst of her comparison of Burton's testimony and self-defense theory as submitted by Attorney Much during his closing statement, with the evidence produced at trial. *See* N.T., 3/25/11, at 83-112. The prosecutor's closing statement, and in particular, her statement that Burton was incredible, reinforced the conflicting theories presented at trial by the parties and suggested to the jury that the Commonwealth's theory of premeditated murder was supported by the evidence, while Burton's theory of self-defense was not. Thus, as the prosecutor's statement in this case was responsive to Attorney Much's statements and reinforced the conflicting theories at trial, we conclude that there is no merit to Burton's claim of prosecutorial misconduct in this instance.

Burton's second allegation of prosecutorial misconduct relates to the prosecutor's statement, "It's not the first time [Burton]'s gone after somebody with a knife." Burton's Brief at 21-22. Burton argues that the

prosecutor's comment was improper and prejudiced him "because the jury may have thereby believed that the prosecutor knew of other occasions in which [Burton] had evidenced a propensity to commit violent acts of assault similar to the one on trial in this case." *Id.* at 22. Furthermore, Burton asserts that Attorney Much's failure to object was prejudicial to his case "[s]ince the origin of the knife was a crucial issue in the case." *Id.* at 24. The PCRA court again concluded that the prosecutor's statement was grounded in the record, and therefore, "was fair game for her [to] address in her closing, as well as a fair response to the argument made by trial counsel." PCRA Court Opinion, 8/11/14, at 33. We agree.

This Court previously held, "[t]he Commonwealth is entitled to comment during closing arguments on matters that might otherwise be objectionable or even outright misconduct, where such comments constitute fair response to matters raised by the defense, or where they are merely responsive to actual evidence admitted during a trial." *Commonwealth v. Culver*, 51 A.3d 866, 876 (Pa. Super. 2012) (citing *Commonwealth v. Trivigno*, 750 A.2d 243, 249 (Pa. 2000)).

Our review of the record reveals that Attorney Much introduced evidence at trial that Murphy previously gave Burton a knife to investigate a possible intruder. *See* N.T., 3/25/11, at 38. Attorney Much testified that because the origin of the knife used to kill Stropas was at issue, his "thinking at the time was if the jury believes that [] Murphy gave [] Burton a knife,

the jury may also believe that [] Murphy gave [Stropas] the knife before he left the house." N.T., 2/27/14, at 89. Thus, although the prosecutor used this evidence to make a negative inference against Burton's case, the record establishes that her comment was made in response to evidence admitted during trial. Accordingly, in accordance with **Culver**, the prosecutor was entitled to make the comment.

Furthermore, even if the prosecutor's comment was improper, Attorney Much established a reasonable strategy for not asserting an objection. With respect to the second prong of the IAC test, this Court has established that

> [g]enerally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. Where matters of strategy and tactics are concerned, a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

**Charleston**, 94 A.3d at 1019 (citing **Commonwealth v. Spotz**, 84 A.3d 294, 311-12 (Pa. 2014)). In conducting this analysis, we are mindful that "[w]e do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken." **Commonwealth v. Pander**, 100 A.3d 626, 631 (Pa. Super. 2014) (internal citations omitted) (quoting

***Commonwealth v. Stewart***, 84 A.3d 701, 706-07 (Pa. Super. 2013) (en banc)).

This Court has held that "[u]nder some circumstances, trial counsel may forego objection to an objectionable remark or seeking a cautionary instruction on a particular point because objections sometimes highlight the issue for the jury, and curative instructions always do." ***Charleston***, 94 A.3d at 1022 (quoting ***Commonwealth v. Koehler***, 36 A.3d 121, 146 (Pa. 2012)). At the PCRA hearing, Attorney Much explained that since Murphy and Burton testified at trial regarding Burton's use of a knife to investigate an intruder, he believed that if he objected to the prosecutor's closing remark, "and it was overruled, [] it would be more damaging than letting the jury sort out what they remembered about the case and that there was no evidence to suggest that [Burton] had ever had a criminal case before involving a knife." N.T., 2/27/14, at 89. Since Attorney Much's actions supported a valid strategy, he cannot be found to be ineffective.

For his final issue on appeal, Burton asserts that Attorney Much provided ineffective assistance when he failed to submit a motion in limine prior to trial to preclude testimony by defense witness, Detective James Frey ("Detective Frey"), that upon arrest, Burton stated that "He came at me with a knife. I had to defend myself. *I think I want to talk to a lawyer*." Burton's Brief at 25-26; N.T., 3/24/11, at 10. Burton argues that the reference to wanting to speak with a lawyer created a suggestion that he

- 17 -

fabricated his statements that he acted in self-defense and could have misled the jurors into concluding that Burton admitted guilt. Burton's Brief at 26-27. The PCRA court, however, determined that this issue was without merit and should be dismissed because Attorney Much had a reasonable strategic basis for eliciting Officer Frey's testimony. PCRA Court Opinion, 8/12/14, at 37. We agree.

Attorney Much testified at the PCRA hearing that his strategy in the case was to pursue a self-defense theory. Although another officer testified as a witness for the Commonwealth regarding Burton's statements after he exited the vehicle, Attorney Much stated that he "wanted the jury to hear that [Burton] told another officer, not just himself testifying, but another police officer, that [Stropas] came at him with a knife and he had to defend himself." N.T., 2/27/14, at 69-70. Attorney Much believed Detective Frey's testimony would reiterate and support a theory of self-defense. *Id***.** Attorney Much further testified that he made a strategic decision to not file a motion in limine to exclude the reference to wanting to speak with a lawyer because he "wanted the first two parts of that statement" and because he believed "it was reasonable for someone to say that they wanted to talk to a lawyer based on the circumstances that [Burton] found himself in at the time that he was pulled over." *Id***.** at 71; *see id***.** at 84. After our review of the record, we conclude that the record supports the PCRA court's determination that Attorney Much "chose a particular course of conduct that

had some reasonable basis designed to effectuate [Burton's] interests." **See Charleston**, 94 A.3d at 1019.

Finally, Attorney Much explained why he did not object when Detective Frey testified that Burton asked to speak with a lawyer, stating, "there are some times that things happen during the course of a trial that I don't want to jump up and object to because then a jury feels that I care about it and it must be important. … I didn't want to bring attention to it." N.T., 2/27/14, at 84. As this Court has established that trial counsel may choose to forego an objection to avoid highlighting the issue for the jury, **see Charleston**, 94 A.3d at 1022, we conclude that Attorney Much's actions supported a valid strategy, and cannot be found to be ineffective. Accordingly, as Burton has failed to establish that Attorney Much provided ineffective assistance of counsel, we affirm the PCRA court's denial of relief.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/5/2015

- 19 -