J-S43035-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| COLBY DAVID ORNER | : | No. 351 MDA 2019 |

Appeal from the PCRA Order Entered January 24, 2019
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0007025-2013

BEFORE:   GANTMAN, P.J.E., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED OCTOBER 04, 2019**

The Commonwealth appeals from the January 24, 2019, order entered in the Court of Common Pleas of York County, which granted Appellee Colby David Orner's ("Orner") first petition under the Post Conviction Relief Act ("PCRA), 42 Pa.C.S.A. § 9541-9546, and awarded him a new trial.  On appeal, the Commonwealth contends the PCRA court erred in awarding Orner a new trial on the basis trial counsel was ineffective in failing to call Evelyn Detter to testify on behalf of Orner at his jury trial.  The Commonwealth specifically challenges the PCRA court's conclusion that Orner proved he was prejudiced by counsel's omission.  After a careful review, we reverse the PCRA court's order and reinstate Orner's judgment of sentence.

A detailed recitation of the underlying facts and procedural history is necessary for our review.  Orner was arrested and charged with various crimes

_____
* Former Justice specially assigned to the Superior Court.

in connection with the rape of the victim, "Ms. B."[1] Represented by counsel,

he proceeded to a jury trial on October 7, 2014, at which numerous witnesses

testified.[2] The trial court previously summarized the relevant testimony

offered by Ms. B. at trial as follows:

> The victim, [Ms. B.], testified that on the evening of December 31, 2012, she returned home from lunch with her daughters and began making plans for New Year's Eve. N.T., 10/7-10/9/2014, at 138-39. She went to her friend's house for about an hour, and when she returned home her boyfriend, [B.K.], and her neighbor, [Orner], were at her house. *Id.* [Ms. B.] testified that [B.K.] and [Orner] had been drinking all day, and that she started drinking with them when she got home. *Id.* at 140. She admitted to having somewhere between 6 to 10 shots of Jagermeister and that she was definitely feeling the effects of the alcohol. *Id.* Around 9:00 [p.m.], [Ms. B.] decided that she had drank enough and went up to her bedroom to call her friend and go to bed. *Id.* at 140-41.
>
> [Ms. B.] [testified] that while she was on the phone with her friend, her boyfriend yelled up the stairs that he and [Orner] were going to the bar. [*Id.*] at 141. [Ms. B.] fell asleep and the next thing she remembered was someone performing oral sex on her. *Id.* at 142. She had assumed it was her boyfriend, but when this person stuck his penis inside of her she opened her eyes and saw it was not her boyfriend, but rather [it was Orner]. *Id.* at 143, 145. [Ms. B.] [testified] she was "sort of out of it" because of how much she had to drink, but that she was pretty sure she said something like "what are you doing?" *Id.* at 145. [Orner] ran out

---

[1] We use initials for the victim's name, as well as her paramour's name, in order to protect the identity of the victim.

[2] We note Orner pleaded "no contest" on March 7, 2014; however, the trial court permitted him to withdraw his plea on June 26, 2014. Orner then proceeded to a trial on September 2, 2014, but it resulted in a mistrial after the jury was chosen but before opening arguments commenced. Orner proceeded to trial again on September 8, 2014, but it also resulted in a mistrial. Subsequently, Orner proceeded to a trial on October 7, 2014, and a jury convicted him of numerous offenses. *See* Trial Court Opinion, filed 6/19/15, at 2-3.

of the room. *Id.* [Ms. B.] [testified] the very next thing she did was call her boyfriend and then she called 911. *Id.* at 146.

The 911 recording was played for the jury, and [Ms. B.] testified that the police directed her to go to the hospital to have an exam done. [*Id.*] at 147-48. [Ms. B.] [testified] she was taken straight back to an examination room where her clothes were removed and placed in bags. *Id.* at 149. Next, a nurse performed an internal exam of her vagina and took samples/swabs. *Id.* After the exam, [Ms. B.] returned home. *Id.* at 150.

Lastly, [Ms. B.] testified about her relationship with [Orner] before this incident took place. She [testified] that he had lived next door to her and she classified their relationship as friends. [*Id.*] at 151. She [testified] that her kids played with his kids and that prior to this [incident] they had no problem with one another. *Id.* She further testified that at no time prior to this did [Orner] make any sexual advances towards her. *Id.* However, [she testified] the night of the incident…"[h]e smacked me in my ass when we were like drinking and partying, but I didn't think anything of it because, I mean, we were just having a good time." *Id.* at 151-52. [Ms. B.] denied ever making any sexual advances towards [Orner]. *Id.* at 152. She also flat out denied ever giving [Orner] consent to perform any kind of sexual activity on her. *Id.* She reiterated that the first time she was fully aware of what was happening was when [Orner] stuck his penis inside of her. *Id.* at 153.

On cross-examination, [Ms. B.] denied that she repeatedly asked [Orner] to slap her butt. [*Id.*] at 158. She also denied showing [Orner] her breasts and having an argument with her boyfriend. *Id.* Counsel also attempted to clarify when exactly [Ms. B.] was aware of what was going on in the bedroom. [Ms. B.] stated that she fell asleep and the very next thing she remembered was "feeling that sensation down there that someone was doing oral to me." *Id.* at 163. She [testified] that at this point her pants and underwear were down. *Id.* However, at no point prior to this did she know anyone was in her bedroom. *Id.*

[Ms. B.] continually [testified] that she thought it was her boyfriend, which is why she did not open her eyes or attempt to push the person off of her. [*Id.*] at 165. She stated, "I knew something was going on, but I guess, yes, I was awake enough to know that, but I still didn't open my eyes." *Id.* Defense counsel asked [Ms. B.] about her statements to her boyfriend, which can be overheard in the 911 call where she said that [Orner] tried to

penetrate her. *Id.* at 166. [Ms. B.] was adamant that [Orner] inserted his penis into her vagina. *Id.*

Trial Court Opinion, filed 6/19/15, at 6-8.

In addition to Ms. B.'s testimony, the Commonwealth offered the testimony of Ms. B.'s live-in boyfriend, B.K., who testified that he had been drinking alcohol with Orner for most of the day on December 31, 2012. N.T., 10/7-10/9/04, at 177-79. Somewhere between 5:00 p.m. and 7:00 p.m., Ms. B. joined them as they drank at the couple's house; however, by 8:00 p.m., Ms. B. indicated she had enough and was going to go to bed. *Id.* at 179-80. B.K. testified that, at this point, he and Orner left the house with the intent of going into a VFW hall ("VFW"),[3] which was just down the hill from the couple's house. *Id.* at 180. However, Orner was not permitted entry into the VFW, so B.K. went inside without him. *Id.* at 181.

B.K. testified that, within an hour of being at the VFW, he received a phone call from Ms. B., who was hysterical, indicating that Orner had just raped her. *Id.* B.K. advised her to call the police, and by the time B.K. walked back to the couple's house, the police were on site. *Id.* B.K. admitted that he was ranting and raving and very upset about what Orner had done to Ms. B. to the point the police placed him in the back of the police car until he calmed down. *Id.* at 185-86.

_____

[3] We recognize that "VFW" stands for "Veterans of Foreign Wars."

- 4 -

B.K. admitted that, prior to the rape, he and Ms. B. would argue when he used too many drugs. *Id.* at 187. He also testified that, within a few days of the rape, Ms. B asked him to move out, and they remained broken up for three or four months. *Id.* The couple then reunited; however, B.K. testified that the following occurred while they were separated:

**Q.** During that time that you were—after she asked you to move out of the house, did anything happen?

**A.** Well, I have a 30 or 40-year friend that is [Orner's] roommate, and in the mentality of an angry, jilted, twisted lover that is now an ex, I was texting the roommate trying to get information out of him, I guess, was part of what I was doing, and part of our texting was that I had made a disparaging comment on one of the texts, and he answered that. He answered that back.

**Q.** What was your disparaging comment?

**A.** I think I said something like, "How was it rape when they were having sex for two years?"

**Q.** To the best of your knowledge, was there any sexual contact between them?

**A.** No.

**Q.** Why would you say that?

**A.** I wanted to see what his response would be, and maybe in the back of my head that we were no longer boyfriend and girlfriend, maybe I was just being angry, mean, and a jilted lover. It was said out of a hated discontent at the time, the mentality I was in. I never once suspected her of having a relationship with [Orner].

**Q.** The night that you were—on that New Year's Eve, did you ever see her make any sexual advances towards him?

**A.** No, sir.

**Q.** Did you ever see him make any sexual advances towards hers?

**A.** No, sir.

**Q.** Did she flash her breasts at you or him?

**A.** No, sir.

*Id.* at 188-90.

Police Officer Scott George testified that, in response to Ms. B.'s 911 call, he arrived at the residence at 10:00 p.m., on December 31, 2012. *Id.* at 208. Ms. B., who was crying, reported she had been asleep and awoke to Orner sexually assaulting her. *Id.* After collecting evidence, Officer George walked out to his police car, and he spoke to Orner, who was standing outside on the sidewalk. *Id.* at 209. Officer George testified as follows on direct-examination regarding the conversation he had with Orner at this time:

> **Q.** Okay. And what was the discussion that you had with him?
>
> **A.** I asked him what happened. [Orner] said that he got to the residence at about 7:30. When he got to the residence, [Ms. B.] and [B.K.] were already there and were already intoxicated. They were drinking Jager. In between the three of them, they drank the whole bottle.
>
> He explained to me that [B.K.] and [Ms. B.] were not currently getting along, and during the course of the evening, that on three separate occasions, [Ms. B.] exposed her breasts to him. He said there was some flirtatious talk during the evening. She went upstairs and went to bed, and shortly thereafter, he left.
>
> **Q.** Okay. Did he indicate that anything had taken place between the two of them?
>
> **A.** Completely denied having sex with her.
>
> **Q.** So you asked him about that?
>
> **A.** Yes.
>
> **Q.** Did he say that he performed oral sex on her?
>
> **A.** No.
>
> **Q.** Did he say he touched her in any way?
>
> **A.** No.
>
> ***
>
> **Q.** And did he state if he had received any contact about the incident prior to speaking with you?

**A.** I don't know if he said he spoke to, it would have been [B.K.].
I don't know if he said he spoke to [B.K.] or not.

**Q.** If I showed you your police report, would that help refresh your
recollections?

**A.** Yeah.

**Q.** Does that help you remember if he indicated that he spoke with
anybody about the incident prior to speaking with you?

**A.** Mr.—yeah, he said he did. [B.K.] called him.

**Q.** And did he say what the call from [B.K.] was about?

**A.** [B.K.] wanted to know if he was having sex with [Ms. B.].

**Q.** And did—did [Orner] tell you what his response was?

**A.** He denied having sex with [Ms. B.].

*Id.* at 209-11.

Erik Dick testified that he has been friends with Orner for thirty years,
and he spoke to him about Ms. B.'s rape allegations. *Id.* at 222-21. Mr. Dick
indicated that Orner told him "he didn't rape her" and the "rape kit…came up
negative or inconclusive." *Id.* at 222-23.

York County Hospital Nurse Geneva Keirn, who is a certified sexual
assault forensic examiner, testified that she conducted the examination upon
Ms. B. on December 31, 2012. *Id.* at 227. During the examination, Ms. B.
reported that she had been asleep and awoke to a tongue in her vagina and
then she felt a penis enter her vagina. *Id.* at 241. She awoke and saw Orner,
who ran. *Id.*

Detective Brian O'Melko testified he interviewed Orner on March 8,
2013, and June 11, 2013, in connection with the sexual assault of Ms. B. *Id.*
at 252-54. Detective O'Melko testified that, when he spoke to Orner on March

8, 2013, "[Orner] told [him] that he did not rape [Ms. B.], and he had no sexual contact with her whatsoever." *Id.* at 252. Detective O'Melko indicated that, during the March 8, 2013, interview, Orner made no allegation that he was having an affair with or had prior sexual contact with Ms. B. *Id.* at 253.

Detective O'Melko testified he obtained a search warrant for Orner's DNA and served it upon Orner on June 11, 2013. *Id.* at 254-56. As he served the search warrant and collected Orner's DNA, Detective O'Melko testified as follows regarding the conversation he had with Orner:

> **Q.** All right. So you said at the time that you served [this warrant] that he wanted to discuss [the situation] further?
>
> **A.** Yes.
>
> **Q.** And what was the discussion?
>
> **A.** He told me that he didn't rape [Ms. B.], [and] that it was a waste of my time. You know, he was saying that [Ms. B.] and [B.K.] are crack heads and things of that nature, so—
>
> ***
>
> **Q.** Okay.
>
> **A.** I told him my job was to serve the search warrant and get the DNA. I didn't want to argue with him. He seemed like he wanted to argue the case there with me. That wasn't what my purpose was.
>
> So actually I was preparing to leave, and he called me back into the room and wanted to discuss it more. So he says, what's up. I said, I can't give you information, that's not my job. My job is to collect information.
>
> So he told me, he said, I didn't rape her. There was a lot of stuff that went on that night. He didn't elaborate. He read the search warrant obviously, which had information in there that there was DNA found, and that's why I was there to collect the DNA evidence from him. And he told me, he said, my shit will be on [Ms. B.], and he told me that he licked his hand and put it on her vagina more than one time.

**Q.** Now, was that the first time that you had heard that?

**A.** That is the first time that I heard that.

**Q.** So when you showed up, he saw—he read the warrant that showed there was his DNA or there was DNA?

**A.** Yes.

**Q.** His story then became, he licked his hand and put it on her?

**A.** Yes.

**Q.** Was there anything else that was said at that time?

**A.** He just said, my DNA—my DNA's going to be on her, but that doesn't prove shit, was his words.

*Id.* at 255-57.

On cross-examination, Detective O'Melko testified that, during the June 11, 2013, interview, Orner continued to deny that he inserted his penis into Ms. B.'s vagina on the evening of December 31, 2012. *Id.* at 268. Detective O'Melko confirmed that he swabbed Orner's mouth to collect the DNA. *Id.* at 281-82. He also confirmed that, following the June 11, 2013, interview, he wrote in his police report that "it is clear that it is [Orner's] position that he did not have sexual contact with [Ms. B.] on the night in question." *Id.* at 283.

Angela Schultheis, a forensic DNA scientist for the Pennsylvania State Police, testified that the swabs from Ms. B.'s rape kit, as well as the swab from Orner's cheek, were compared. *Id.* at 290. She opined that "the DNA profile that [she] obtained from the question[ed] item[s], the swab[s], was consistent with a mixture with at least three individuals, and both [Ms. B.] and [Orner] could be included as contributors to that mixture." *Id.* She further

opined that there was a "third unidentified individual" who contributed DNA to the mixture. *Id.*

Scott Stambaugh testified on behalf of Orner at trial. He confirmed that he resides with Orner and has known [B.K.] for forty years. *Id.* at 305. He also confirmed that he has known Ms. B. for approximately fifteen years and, during this time, she and B.K. were paramours. *Id.* at 307. Mr. Stambaugh testified that, sometime after December 31, 2012, he received a text message from B.K. in which B.K. "said that even he knew that [Ms. B.] and [Orner] were messing around for two years." *Id.* at 306. Mr. Stambaugh testified that Ms. B. and B.K. "seem[ed] to have fights [and] [i]t's a pretty rocky relationship[.]" *Id.* at 307.

Orner testified in his own defense. He testified that he and B.K. had a "good relationship" and they spent a lot of time together. *Id.* at 310-12. However, Orner testified that he often spent time at B.K. and Ms. B's house without B.K. or the children being present. *Id.* at 312. Specifically, he testified as follows on direct-examination:

> **Q.** Can you please describe your relationship with [Ms. B.] in December [2012]?
>
> **A.** We had a good relationship. I mean, everybody was getting along. Me and her were kind of a little flirtatious, you know. We, you know, we were messing around a little bit, but other than that, it was just kind of, you know, a good relationship between all of us. We were kind of all good friends.
>
> Now, they had a rocky relationship, so I mean, they were always fighting. But other than that, everything was pretty good.
>
> **Q.** To your knowledge, at that time, did [B.K.] know that you were having sexual contact with [Ms. B.]?

**A.** No.

**Q.** Were you trying to keep that from him?

**A.** Obviously, yes.

*Id.* at 313.

With regard to December 31, 2012, Orner indicated he arrived at B.K. and Ms. B's residence at approximately 7:00 p.m. *Id.* at 315. Orner testified that he walked upstairs with B.K. to the bedroom, and Ms. B. was "laying [*sic*] there naked. She kind of—half naked, covered herself up, which was nothing normal—or abnormal. I mean, that was pretty much normal." *Id.* at 316. Orner testified Ms. B. was crying and told Orner that B.K. had been calling her names. *Id.* at 318. Orner testified that he sat on the edge of the bed by Ms. B. while B.K. sat in a chair, and Orner told the couple he just wanted to drink and have a good time. *Id.* at 316. Orner testified the trio drank and smoked in the bedroom for approximately forty-five minutes and then they went downstairs to continue "partying" in the kitchen. *Id.* at 317-18.

Orner testified that, while they were in the kitchen, Ms. B. told Orner to "smack her ass." *Id.* at 318. Orner testified that he felt "odd" doing this in front of B.K., but he complied. *Id.* Ms. B. then stated, "[T]hat's tight. That's from that Zumba[.]" *Id.* at 318-19. Orner indicated the trio continued drinking in the kitchen until approximately 9:00 p.m., at which time Ms. B. indicated she was going to bed while B.K. mentioned that he was going to go to the VFW. *Id.* at 319. Orner and B.K. then left the residence together;

however, Orner returned to the residence approximately twenty minutes later and went up to the bedroom. *Id.* at 321.

Orner admitted that Ms. B. did not explicitly ask him to come back to the house or go into the bedroom with her; however, since they were already "having some sexual contact" prior to December 31, 2012, he assumed she wanted him to come to the bedroom after B.K. left. *Id.* at 320. Orner admitted that he and Ms. B. "never had sex" prior to December 31, 2012, but they "fooled around here and there." *Id.*

Orner indicated that, upon entering the bedroom, he and Ms. B., who was lying on the bed, "acknowledged each other[,]" he pulled down her pants, and he performed oral sex on her. *Id.* at 322. He indicated that, after approximately two minutes of this activity, Ms. B. indicated she did not want to "do this tonight," so Orner got up and left. *Id.* He denied that he took his penis out of his pants or inserted his penis into Ms. B.'s vagina. *Id.*

Orner admitted that he subsequently spoke to Officer George. He explained that, when Officer George asked him whether he had sex with Ms. B., he understood the question to mean whether his penis entered Ms. B.'s vagina. *Id.* at 324. He testified that, since such did not occur, he answered "no." *Id.* Orner also admitted that, on March 8, 2013, he told Detective O'Melko that he "did not have sex with [Ms. B.]." *Id.* at 328. Orner explained that he made this statement for the same reasons he told Officer George that he and Ms. B. did not have sex. *Id.* Orner admitted that he told Detective

O'Melko on June 11, 2013, that the police would find his DNA on Ms. B. *Id.* at 330-31. Orner opined that Ms. B. accused him of raping her because she was trying to get attention from B.K. *Id.* at 325.

On cross-examination, Orner testified that, prior to December 31, 2012, he and Ms. B. had a "flirtation, sexual relations[,]" which had been ongoing for "a little over a year." *Id.* at 339. Orner testified that Ms. B. lied under oath when she testified that she and Orner did not have a prior sexual relationship. *Id.* Orner testified the sexual relationship between him and Ms. B. was a "secret," which B.K. did not know. *Id.* at 339-40.

With regard to the December 31, 2012, incident, Orner admitted Ms. B. never explicitly asked him to come back to the house or meet her in the bedroom; however, Orner assumed it would "not be a problem" because of their history. *Id.* at 343. He indicated that, when he entered the bedroom, Ms. B. looked at him, so he pulled down her pants and put his tongue in her vagina. *Id.* at 347. He said Ms. B. then changed her mind, so he stopped. *Id.*

With regard to Orner informing Detective O'Melko at the June 11, 2013, interview that he had licked his hand and touched Ms. B.'s vagina, Orner explained on cross-examination that this act occurred while he was in the kitchen with Ms. B. and B.K., but B.K. did not see the act occur. *Id.* at 362. He explained that he never informed the police that he had oral sex with Ms.

B. on December 31, 2012, because he was not cooperating with the police. *Id.*

On redirect-examination, Orner testified that all of the "sexually related acts," including oral sex, occurring between him and Ms. B. on December 31, 2012, had occurred between them before. *Id.* at 364-65. He testified the only new component was that B.K. was present on December 31, 2012, for some of the sexual interaction between Orner and Ms. B. *Id.* at 365.

Russell Detter, who also testified as a defense witness, indicated that he and his family, including his wife, Evelyn Detter, spent a lot of time with Ms. B., B.K., and Orner. *Id.* at 367-68. He testified they had cook-outs, and the kids swam in Ms. B.'s and B.K.'s pool. *Id.* Mr. Detter testified there were occasions when he saw Orner at the house when only Ms. B. was present, particularly when B.K. was at work. *Id.* at 369. Mr. Detter testified as follows on direct-examination:

> **Q.** Sometime prior to December 31st, 2012, did you hear or have the opportunity to observe [Ms. B.] make any statements regarding a relationship with [Orner]?
>
> ***
>
> **Q.** Did you have that opportunity?
>
> **A.** Yes.
>
> **Q.** And what did she say?
>
> **A.** One time my wife and I were both sitting there on the deck, and we were out chatting. [Orner] wasn't there at the time, and [B.K.] was at work, and she said how she would like to have sex with him.
>
> **Q.** And this was a couple months prior to December 12, 2013— I'm sorry December 31st, 2012?

**A.** Yes.

*Id.* at 370.

On cross-examination, Mr. Detter reiterated that Ms. B. told him and his wife that "she wanted to have sex with [Orner];" however, he could not remember the month or date of the conversation. *Id.* at 372. Mr. Detter indicated that, after December 31, 2012, he and his family no longer went to Ms. B.'s and B.K.'s house; however, on January 1, 2013, Ms. B. came to his house, and she had a conversation with his wife. *Id.* at 373. He noted that his wife then asked him to let Ms. B. borrow his shotgun because Ms. B. was scared. *Id.* at 374.

The Commonwealth recalled Ms. B. as a witness, and she specifically denied having a conversation with Mr. Detter or his wife wherein she indicated that she wanted to have sex with Orner. *Id.* at 383. Ms. B. denied that she was home or visiting the Detter residence on January 1, 2013; however, she admitted that, on January 2, 2013, she spoke to Mrs. Detter. *Id.* at 384. Ms. B. indicated that she asked Mrs. Detter to come to her house to help clean it because B.K. had "smashed up [the] house" and "was very angry" on January 1, 2013. *Id.* at 384-85.

At the conclusion of all testimony, the jury convicted Orner of rape, involuntary deviate sexual intercourse ("IDSI"), sexual assault, and indecent assault. On November 12, 2014, the trial court sentenced him to six years to fourteen years in prison for rape and a concurrent term of five years to ten

years in prison for sexual assault. IDSI and indecent assault merged with rape for the purposes of sentencing. Orner filed a post-sentence motion, which the trial court denied, and Orner filed a timely direct appeal to this Court.

On appeal, Orner's counsel sought to withdraw and filed a brief pursuant to **Anders v. California**, 386 U.S. 738, 87 S.Ct. 1396 (1967), and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009). Moreover, Orner filed a *pro se* petition seeking to have his direct appeal discontinued. A panel of this Court examined the issues presented in appellate counsel's petition to withdraw, and concluding there were no non-frivolous issues, granted counsel's petition to withdraw. **Commonwealth v. Orner**, No. 673 MDA 2015 (Pa.Super. filed 4/29/16) (unpublished memorandum). Additionally, upon consideration of Orner's *pro se* petition, the panel elected to discontinue the appeal, as opposed to affirm the judgment of sentence. **See id.**

On or about March 30, 2017, Orner filed a timely, *pro se* PCRA petition[4] in which he averred, *inter alia*, that trial counsel was ineffective in failing to

---

[4] Orner's judgment of sentence became final on April 29, 2016, when this Court granted his petition to discontinue his appeal. **See Commonwealth v. McKeever**, 947 A.2d 782, 785 (Pa.Super. 2008) (finding judgment of sentence final on date the appellant discontinued appeal). Thus, his March 30, 2017, PCRA petition was timely filed. **See** 42 Pa.C.S.A. § 9545(b)(1) (providing that a PCRA petition shall be filed within one year of the date the underlying judgment becomes final).

call Evelyn Detter to testify at trial. Counsel was appointed to assist Orner, and counsel filed a supplemental PCRA petition. The Commonwealth filed a memorandum in opposition to Orner's petition.

The matter proceeded to a PCRA evidentiary hearing at which Orner's trial counsel, Marc J. Semke, Esquire, and Evelyn Detter testified. Specifically, Attorney Semke testified his defense strategy was that Ms. B. and Orner engaged in consensual sex during the incident in question. N.T., 8/15/18, at 9. Attorney Semke admitted that, prior to trial, Orner indicated that Mrs. Detter was a possible witness, and accordingly, Attorney Semke hired a private investigator, who took a statement from Mrs. Detter on May 20, 2014. *Id.* In the statement, Mrs. Detter told the private investigator that "the victim had told [her] that this was consensual and that she was caught in the act by her boyfriend." *Id.* at 10.

Attorney Semke testified he intended to call Mrs. Detter as a witness at Orner's trial. *Id.* at 13. To this end, Attorney Semke prepared a subpoena for Mrs. Detter to testify, and he "sent [it] by first class mail." *Id.* at 16. He acknowledged that he did not "personally serve a subpoena" or secure Mrs. Detter's signature indicating she had received the subpoena. *Id.* at 15-16. Attorney Semke testified that, immediately after Orner's trial began, he called Mr. and Mrs. Detter to inform them of which day they would be called as witnesses; however, "[t]hey weren't returning [his] calls." *Id.* at 17. Accordingly, Attorney Semke informed the trial court that he was attempting

to locate Mr. and Mrs. Detter, and therefore, the trial court "agreed to send sheriff's out in an effort to locate [them]." *Id.* The Sheriff's Office located Mr. Detter, who testified at Orner's trial, but the Sheriff's Office was unable to locate Mrs. Detter. *Id.*

Upon cross-examination, Attorney Semke clarified that his trial strategy was that Ms. B. and Orner had consensual oral sex, but they had no penile/vaginal sexual intercourse. *Id.* at 21. Attorney Semke admitted Orner consistently denied that he penetrated Ms. B.'s vagina with his penis, and Orner never testified that Ms. B.'s boyfriend, B.K., "caught them" having sex on the night of the incident. *Id.* Thus, Attorney Semke admitted that Mrs. Detter's May 20, 2014, statement regarding what Ms. B. allegedly told her about the incident was, at least in part, inconsistent with Orner's trial testimony. *Id.* at 22.

Mrs. Detter testified she was friends with and a neighbor of Ms. B., and following the December 31, 2012, incident, she provided a written statement to a private investigator. *Id.* at 30-32. Mrs. Detter indicated she had conversations with Attorney Semke prior to Orner's trial, and she was prepared to be a witness for Orner; however, she did not receive a subpoena. *Id.* at 33. With regard to her whereabouts at the time of Orner's October 2014 trial, Mrs. Detter testified as follows on direct-examination:

**Q.** Were you around—were you in Pennsylvania during [the] time period [of Orner's October 2014 trial]?
**A.** When all of this stuff was going on?

- 18 -

**Q.** The trial?

**A.** No, I wasn't here.

**Q.** Where were you?

**A.** Well, I get a little sentimental here. My father has—he was diagnosed with dementia and Alzheimer's. I was running back and forth and leaving the house and he was put in a hospital and stuff. And he was running around with machetes and knives and going into people's houses.

And we had to get him hospitalized. That's when we found out he had dementia and Alzheimer's. I, as the oldest daughter, had to go in and take care of my father before I took care of anything else.

**Q.** How long were you there?

**A.** Oh, gosh, about a week or two.

**THE COURT:** Where were you, ma'm? I don't think you ever told us.

**THE WITNESS:** Atlantic City, New Jersey.

**THE COURT:** Thank you.

*Id.* at 33-34.

Mrs. Detter testified she was not aware that Orner had gone to trial until the week before the PCRA evidentiary hearing, when Orner's PCRA attorney contacted her. *Id.* at 34. Mrs. Detter indicated that, had she been called to testify at Orner's October 2014 trial, she would have testified that Ms. B. "always had trouble with her boyfriend[.]" *Id.* at 35. Moreover, with regard to what she would have testified to at Orner's trial, the following exchange occurred on direct-examination:

**Q.** Did you talk to [Ms. B.] about this alleged incident?

**A.** Yes. After everything happened, [Ms. B.] came to my house. This was, I think, the second or the third after, I guess, they were

- 19 -

looking for [Orner] because, I guess, he had left. And then she had told me everything that happened.

**Q.** Okay. I don't want to breeze through that. What did she tell you happened?

**A.** Okay. Um, they were supposed to go to the VFW.

**Q.** I'm going to interrupt you again. When you say they, who do you mean by they?

**A.** Okay. It would be [Orner, Ms. B., and B.K.]. They were all supposed to go ahead and go to the VFW that night, which I think it was the 31st because it was almost New Year's. He left later because she was with me for a while at my house getting ready, talking about what they were going to do that night.

And so, they went down to the VFW, and me and my husband stayed home. She said to go ahead and just get everything out there quickly. She came out and they were all going into the VFW. She supposedly was supposed to be coming back home that night early because she wanted to get her boyfriend/husband, I don't know if they are married or not. They have been together so long.

But supposedly they wanted to get him drunk to go ahead and stay there. So, [Ms. B.] could go ahead come to the house and [Orner] was supposed to go ahead and meet her at her house, which was not—it was like three or four blocks or whatever.

After all of that happened and she said that they got into a sexual contact. They were doing their little thing or whatever it was, and like I said, I don't know what happened inside the house. But she told me, I guess, [B.K.] came in—into the house and he was raging. Did you leave and where are you at and screaming in the house.

And that's when, I guess, [Orner] went and jumped off of her and went and grabbed his stuff and ran out of the house.

[B.K.] went and had tore up the place. Then a day or two— well, this was two days later she came—this is when I found out about everything, two days later. She was at my house and she asked me for a 410 I owned, which I use for hunting.

So, the 410 that she wanted was to protect herself from [B.K.]. And to me, that didn't make any sense because why she is trying to protect herself from [B.K.] when supposedly all of this happened to her that night.

**Q.** Did she ever say that [Orner] had raped her?

**A.** She did not say that.

**Q.** When you said that she mentioned that [B.K.] came in, did she say that [B.K.] came in while she was having sex with Mr. Orner?

**A.** Yes.

**Q.** And did she say anything else?

**A.** She was just upset that she got caught. She was like, I guess [she] and [Orner] were having—I know that they were having a sexual relationship because [Ms. B.] gave [Orner] a key.

∗∗∗

[Orner] had a key to the house and [Ms. B.] worked, I guess, it is on Main Street or George Street, whichever one you prefer to call it. She worked and at 12:00 o'clock or 1:00 o'clock, depending on [when] her break was, [Orner] would always—most of the time be there waiting on her. And I asked her why is [Orner] at your house?

She is like we have a little rendezvous while [B.K.] is out at the golf course because that's where he used to work at and I didn't know anything about this. I didn't know [B.K.] was working. [B.K.] was mostly around the house. She told me he was working at the golf course or go on his boat or fishing or whatever with the girls and then that's when I had found out that they were already an item before all of this stuff happened.

**Q.** How long did you continue to live in the same area with [Ms. B.]?

**A.** I lived there—let's see, '18—I guess not too long after that we left.

**Q.** At no point she said to you that Mr. Orner raped her?

**A.** No.

**Q.** And were you willing and prepared to testify as you did today back in October of 2014?

**A.** Yes.

*Id.* at 36-40.

On cross-examination, Mrs. Detter testified that, during 2014, she went to Atlantic City often because her father was having problems. *Id.* at 41. She

indicated that she went to her father's house on September 29, 2014, and she stayed there for two weeks while Mr. Detter remained at home. *Id.* She admitted Mr. Detter was receiving the mail at the house during this time. *Id.* at 42. Mrs. Detter admitted that, in her statement that she gave to the private detective, Mrs. Detter indicated Ms. B. told her that she, B.K., and Orner went to the VFW on the night of the incident, but Ms. B. left because she was not feeling well. *Id.* at 43.

At the conclusion of the PCRA hearing, by order and opinion entered on January 24, 2019, the PCRA court granted Orner's PCRA petition and awarded him a new trial on the basis trial counsel was ineffective in failing to call Mrs. Detter to testify at Orner's October 2014 trial. On February 22, 2019, the Commonwealth filed a timely notice of appeal from the PCRA court's order, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, the Commonwealth contends the PCRA court erred in granting Orner PCRA relief on his claim that trial counsel was ineffective in failing to call Evelyn Detter as a witness at Orner's jury trial.

We note that "[i]n reviewing the propriety of an order granting or denying PCRA relief, an appellate court is limited to ascertaining whether the record supports the determination of the PCRA court and whether the ruling is free of legal error." *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009). We pay great deference to the findings of the PCRA court, "but its legal determinations are subject to our plenary review." *Id.*

The essence of a claim of ineffective assistance of counsel is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. As originally established by the United States Supreme Court in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.

To satisfy the prejudice prong of this test when raising a claim of ineffectiveness for the failure to call a potential witness at trial, our Supreme Court has instructed that the PCRA petitioner must establish that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew, or should have known, of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

**Commonwealth v. Wantz**, 84 A.3d 324, 331 (Pa.Super. 2014) (citations omitted).

To demonstrate **Strickland** prejudice, a petitioner must show how the uncalled witness['s] testimony would have been beneficial under the circumstances of the case. Counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense.

**Commonwealth v. Matias**, 63 A.3d 807, 810-11 (Pa.Super. 2013) (*en banc*) (quotation marks and quotations omitted).

In the case *sub judice*, the Commonwealth contends the PCRA court erred in holding Orner met the prejudice prong of the ineffectiveness test.[5] In this vein, the Commonwealth avers the PCRA court erred in holding Orner proved the absence of Mrs. Detter's testimony was so prejudicial as to have denied him a fair trial.[6] Accordingly, the Commonwealth argues Orner failed to demonstrate that, but for trial counsel's omission, there was a reasonable probability of a different outcome at Orner's trial. For the reasons discussed *infra*, we agree with the Commonwealth.

At the PCRA evidentiary hearing, Mrs. Detter indicated that, had she been called to testify at Orner's jury trial, she would have testified that Ms. B. and her paramour, B.K., had a "troubled" relationship, and prior to the incident in question, Ms. B. and Orner had a sexual relationship. N.T., 3/30/17, at 36-40. Moreover, as to the incident in question, Mrs. Detter admitted that she was not a witness to and did not know what happened inside the house. **Id.** However, she indicated that, the next day, Ms. B. told her that Orner and she had made a plan to get B.K. drunk on New Year's Eve so they could have "sexual contact," and to this end, the trio went to the VFW to drink. **Id.** Mrs.

---

[5] The Commonwealth does not challenge the PCRA court's conclusion that Orner's underlying legal claim is of arguable merit or that counsel's inaction lacked any objectively reasonable basis designed to effectuate his client's interest. **See Strickland**, **supra**.

[6] The Commonwealth does not dispute that Orner demonstrated Mrs. Detter existed, she was available to testify, trial counsel knew of her existence, and she was willing to testify for Orner.

Detter indicated Ms. B. told her that, while she and Orner were having sex, B.K. walked into the room, leading to Orner "jumping off" of Ms. B. and running away. *Id.*

As the Commonwealth argues, even assuming, *arguendo*, the jury found Mrs. Detter's proffered testimony to be credible, the testimony was cumulative, in some respects, to testimony offered by other witnesses at Orner's trial, and it was contradictory, in other respects, to Orner's own trial testimony and defense strategy.

For instance, as to Mrs. Detter's PCRA hearing testimony that Ms. B. and B.K. had a "troubled" relationship, this testimony was cumulative of the following: B.K.'s testimony that he and Ms. B. argued often prior to the night in question; Officer George's testimony that, on the night in question, Orner reported that Ms. B. and B.K. had been arguing; Mr. Stambaugh's testimony that Ms. B. and B.K. had a "rocky relationship;" and Orner's testimony that Ms. B. and B.K. had a "rocky relationship" and were always fighting. ***See Commonwealth v. Tharp***, 627 Pa. 673, 101 A.3d 736, 758 (2014) (holding the appellant failed to demonstrate prejudice where the proposed witness's testimony would have been merely cumulative of other evidence).

As to Mrs. Detter's PCRA hearing testimony that Ms. B. told her that she and Orner planned to get B.K. drunk on New Year's Eve so that they could have "sexual contact," and the trio went to the VFW, this testimony was contradictory to Orner's own trial testimony. Orner testified that, in relation

to the night in question, Ms. B. did not go to the VFW, and Ms. B. did not explicitly ask him to engage in sexual contact; but rather, he assumed she would want to engage in such contact.

Further, as to Mrs. Detter's PCRA hearing testimony that Ms. B. told her that, while Ms. B. and Orner were having sex, B.K. walked into the room, leading to Orner "jumping off" of Ms. B. and running away, this testimony was also contradictory to Orner's own trial testimony. Orner testified that, on the night in question, he stopped having oral sex with Ms. B. because she indicated that she did not want to "do this tonight," so he simply left the residence. To the extent Mrs. Detter's testimony implied Ms. B. and Orner had penile/vaginal sexual intercourse on the night in question, such implication was contrary to Orner's trial testimony that he and Ms. B. did not engage in penile/vaginal sexual intercourse. *See Commonwealth v. Sneed*, 616 Pa. 1, 45 A.3d 1096 (2012) (holding counsel cannot be ineffective for failing to call witness where witness's testimony would not have been helpful to the defense).

Moreover, as to Mrs. Detter's PCRA hearing testimony that, prior to the incident in question, Ms. B. and Orner had a sexual relationship, we note this proffered testimony was cumulative of Orner's trial testimony that he and Ms. B. had a prior sexual relationship. To the extent Mrs. Detter implied Ms. B. and Orner had a history of prior penile/vaginal sexual intercourse, such testimony would have been contradictory to Orner's trial testimony.

Finally, it is noteworthy that Mrs. Detter admitted at the PCRA hearing that she has no first-hand knowledge of the specific sexual incident at issue and she was not present in the house at the time it occurred. *See Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726 (2004) (finding the appellant failed to prove trial counsel was ineffective in failing to call a witness who had no first-hand knowledge of the murder).

Based on the aforementioned, we agree with the Commonwealth that any benefit Orner would have reaped from the portions of Mrs. Detter's testimony that were cumulative of other witnesses' testimony would have been undermined by the conflicts between her proffered testimony and Orner's trial testimony. Indeed, it is not inconceivable that the conflicts would have harmed Orner more than he gained from the additional cumulative testimony. We conclude Orner has failed to demonstrate that "there is a reasonable probability that the outcome of the proceedings would have been different" absent counsel's omission. *Wantz*, 84 A.3d at 331. Accordingly, we conclude the PCRA court's determination that Orner was sufficiently prejudiced by counsel's omission to warrant relief constitutes legal error.

For all of the aforementioned reasons, we reverse the PCRA court's January 24, 2019, order granting Orner a new trial, and we reinstate Orner's judgment of sentence.

Order reversed and judgment of sentence reinstated.

Judge Dubow joins the memorandum.

P.J.E. Gantman notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/04/2019