**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JORGE LUIS CARABALLO | : | |
| | : | |
| Appellant | : | No. 713 MDA 2024 |

Appeal from the PCRA Order Entered April 23, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0006259-2019

BEFORE: OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.: **FILED: JANUARY 8, 2025**

Appellant, Jorge Luis Caraballo, appeals from the April 23, 2024 order dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546. We affirm.

This Court previously summarized the facts of this case as follows.

> As gleaned from the testimony adduced at trial, until October 29, 2019, [Appellant] resided with his wife, Amanda Caraballo, his biological son, E.C., born in 2008, and Amanda's biological daughter, J.R., born in 2011 [(collectively, the "Children")] . The house featured a "Ring" doorbell, which allowed for [Appellant] to view, *via* a phone application, "what was happening at the front door[.]" In addition, there were other cameras set up, accessible *via* other phone applications: "one on the outside of the house right above the [side] door, and then . . . one on the inside[.]"
>
> At trial, J.R. was the first victim to testify. Beginning when she was in first or second grade, [Appellant] "started doing bad things to [her]." The first incident J.R. could remember involved [Appellant] repeatedly kissing her on the cheek when they were on the living room couch. A second incident, sometime later, featured [Appellant] again kissing J.R. on the cheek. This time,

however, he also kissed her on the lips and further touched her ribs. The event took place in J.R.'s bedroom, and [Appellant] told her not to tell anybody about what had happened.

J.R. remembered yet another interaction between her and [Appellant] when she was six and one-half years old. On that date and in [Appellant's] bedroom, [Appellant] started kissing her on the cheek and on her clothing. Eventually, [Appellant] took all of her clothing off. Then, "he started doing really bad stuff to [her]." Specifically, after he unzipped his jeans, J.R. saw [Appellant's] genitals. After that, [Appellant's] penis "touch[ed]" J.R.'s vagina. J.R. conveyed that [Appellant] stuck his penis inside of her while she was [lying] on her back. [Appellant] was wearing a condom at the time. J.R. also indicated that "white clear stuff" came out of [Appellant's] penis. Like the prior incident, [Appellant] told J.R. not to tell anybody.

On a different occasion in yet another room of the house, [Appellant] touched J.R.'s breasts over her shirt. J.R. testified that [Appellant's] penis was pressed against J.R. At some point, [Appellant's] penis went inside of her anus. [Appellant] used a condom, and "white stuff" came out of his penis.

Broadly, J.R. recounted that [Appellant's] penis went into her vagina "[a] lot." [Appellant] did not use a condom every time. J.R. also stated that [Appellant] stuck his penis into her anus "[a] couple times." Most of the time, "white stuff" would come out of his penis. Additionally, [Appellant] stuck his penis into J.R.'s mouth a couple of times. J.R. tasted the substance that came out of [Appellant's] penis, indicating that either [Appellant's] ejaculate or his penis tasted "[s]our."

To perpetrate these acts, [Appellant] would find times when the rest of the household was at school or work. [Appellant] would close and lock the door of whatever room he and J.R. were in, and if someone came home, [Appellant] would tell J.R. "to get dressed fast and get out." [Appellant] would look at the cameras that were set up around the house to determine if anyone else was present at the house when the assaults occurred. J.R. first told somebody about what [Appellant] had been doing to her when she was eight and one-half years old.

E.C. was the second victim to take the stand. E.C. first started experiencing "bad things" at the hands of [Appellant] when he was nine years old. E.C. recalled a time when [Appellant] came

up behind him, dropped the towel he had been wearing, and then, completely nude, said to E.C., "this is what a grown man looks like." After that, [Appellant] "came close to [him], . . . made [him] get on [his] knees, and then he made [him] suck [Appellant's] private part" with his mouth. [Appellant] then proceeded to stick his penis in E.C.'s anus. [Appellant] "told [E.C.] it was a normal father and son thing." [Appellant] instructed E.C. not to tell anybody what had happened.

E.C. then recalled [Appellant] sticking his penis into E.C.'s anus when [Appellant] was suspended from work. [Appellant] "made [E.C.] suck his private part." E.C. also described [Appellant's] use of cameras around the house. [Appellant] would "turn on the cameras to make sure no one was coming[.]"

E.C. would go on to describe a multitude of situations where [Appellant] would force him to engage in oral and anal sex. [Appellant] asked E.C. if he was "scared to hold [Appellant's] private part." When E.C. failed to clean his room one time, [Appellant] "took [him] in [his] room and [Appellant] bent [him] over [his] bed and he put his private part in [E.C.'s anus]."

E.C. also recalled an incident where he had a milkshake. [Appellant] "called [him] in his room and then he told [him] to suck his private part, but before [E.C.] did" he was instructed to "drink some" of that milkshake. Although E.C. told [Appellant] that the milkshake tasted weird, eventually throwing it away, [Appellant] "still made [him] suck his private part."

E.C. then discussed a time where he physically got on top of [Appellant]. That day, [Appellant] first told him "to suck his private part." However, thereafter, [Appellant's] private part went into his anus. E.C. stated that it felt different when he was on top of [Appellant], hurting more.

[Appellant] got into a bathtub with E.C. the one time, making E.C. suck his private part on that occasion, too. [Appellant] then "put his private part in [E.C.'s anus]." On a camping trip, which involved the two of them sharing a tent, [Appellant] "bent [E.C.] over and then put his private part in [his anus]."

[Appellant] would, at times, require E.C. to wear a wrestling outfit. When E.C. wore this clothing, [Appellant] stuck "his private part in [E.C.'s anus]." [Appellant] also "put his private part in [E.C.'s] mouth." [Appellant] would wear pajamas with

a hole in them. [Appellant] "would pull his private part out of the hole and . . . put it in [E.C.'s anus]."

[Appellant] also had a propensity to utilize sex toys in his engagements with E.C., sticking them up E.C.'s anus. Finally, E.C. specified that, throughout many of these assaults, [Appellant] would "kiss or lick" his face.

The matter proceeded to a two-day bench trial, which involved, *inter alia*, hearing the testimony of five of the Commonwealth's witnesses, including J.R. and E.C. [Appellant] was ultimately found guilty of the [four counts of involuntary deviate sexual intercourse; rape; two counts of unlawful contact with a minor; incest, two counts of indecent assault, two counts of corruption of minors, and criminal use of a communication facility. Thereafter, the trial court ordered the Pennsylvania Sexual Offenders Assessment Board ("SOAB") to determine whether Appellant met the criteria of a Sexually Violent Predator ("SVP"). Ultimately], just prior to sentencing, [Appellant] was adjudicated a [SVP. On July 15, 2022, the trial court sentenced Appellant to an aggregate term of 48 to 96 years' incarceration.]

***Commonwealth v. Caraballo***, 2023 WL 4945173 *1, *1-*3 (Pa. Super. 2023) (non-precedential decision) (citations and footnotes omitted). This Court affirmed Appellant's judgment of sentence on August 3, 2023. ***Id.*** Appellant did not seek further review.

On November 21, 2023, Appellant filed a *pro se* PCRA petition, alleging that his trial counsel provided ineffective assistance because she failed "to contact Desiree Cordle[] or present her as a witness at trial, and that[,] but for this failure[,] the outcome of his trial court have been different." PCRA Court Opinion, 4/23/24, at *2 (unpaginated), *citing* Appellant's *pro se* PCRA petition, 11/21/23, at 4. On November 22, 2023, the PCRA court appointed counsel. Rather than filing an amended PCRA petition on Appellant's behalf,

PCRA counsel filed a **Turner/Finley**[1] no-merit letter, as well as a petition to withdraw as counsel. The PCRA court, however, denied counsel's request and scheduled an evidentiary hearing on Appellant's petition. The PCRA court convened an evidentiary hearing on March 7, 2024 and March 25, 2024, during which Appellant, Desiree Cordle and trial counsel testified. On April 23, 2024, the PCRA court issued an order denying Appellant's petition. This timely appeal followed.

Appellant raises the following issue for our consideration.

> Whether the trial court abused its discretion by dismissing [Appellant's PCRA] petition?

Appellant's Brief at *5 (unpaginated).

On appeal, Appellant challenges the PCRA court's order dismissing his petition. Per Appellant, trial counsel's failure to interview Cordle or call her as a witness at trial was not based upon a legitimate strategy and prejudiced him. We disagree.

This Court previously stated:

> Our standard of review of an order denying PCRA relief is whether the record supports the PCRA court's findings of fact, and whether the PCRA court's determination is free of legal error. A PCRA petitioner must establish the claim by a preponderance of the evidence.
>
> The essence of a claim of ineffective assistance of counsel is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was

---

[1] **Commonwealth v. Turner**, 544 A.2d 927 (Pa. 1988); **see also Commonwealth v. Finley**, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

rendered unfair and the verdict rendered suspect. As originally established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.

To satisfy the prejudice prong of this test when raising a claim of ineffectiveness for the failure to call a potential witness at trial, our Supreme Court has instructed that the PCRA petitioner must establish that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew, or should have known, of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Sneed*, 45 A.3d 1096, 1108–[11]09 (Pa. 2012).

*Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa. Super. 2014) (some citations omitted).

Herein, we initially note that, based upon testimony from Cordle, Appellant, and trial counsel, it is undisputed that Cordle exists and that Cordle was willing to testify during Appellant's trial as a defense witness. Further, it is undisputed that Appellant informed trial counsel about Cordle and that trial counsel did not interview Cordle or present Cordle as a witness as Appellant's trial. *See* Trial Court Opinion, 4/23/24, at *4 (unpaginated) (explaining that Cordle "clearly exists," that she was "willing to testify at [Appellant's] trial in 2021," and that trial counsel "was specifically advised of Cordle's potential value as a witness on at least two occasions"); *see also* N.T. Hearing, 3/7/24,

at 16; N.T. Hearing 3/25/24, at 5-6.  Hence, the only element in question is whether trial counsel's failure to call Cordle as a witness prejudiced Appellant.

Upon review we, like the PCRA court, conclude that Appellant's claim fails for lack of prejudice.  Importantly, Appellant avers that, if Cordle testified during trial, she would have explained that the Children fabricated the allegations against Appellant because he disciplined them harshly.  **See** Appellant's Brief at *15 (unpaginated); **see also** N.T. Hearing, 3/25/24, at 7-8 (trial counsel testifying that Cordle "would have testified to the effect [Appellant's disciplinary tendencies] could have been a motive for which the . . . charges were alleged").  As pointed out by the PCRA court, however, Cordle made the following statement regarding her proposed trial testimony:

> I would have been able to testify for the fact that I lived in the household with [Appellant and Appellant's] wife for about 11 months.  I could have testified about his interactions with the [C]hildren, how they interacted with each other, how the [C]hildren loved him to death, things like that[.]

N.T. Hearing, 3/7/24, at 16.  Similarly, Cordle averred:

> They loved their father.  They never really had any bad things to say or never acted in a sad way, bad way, or anything toward him.  He would come home.  They would be happy to see him. They would ask for him to come watch movies with them, all that.

**Id.** at 18.  Hence, in contrast to Appellant's claim, Cordle's testimony did not demonstrate that, because of his harsh discipline, the Children had a motive to fabricate their claims against him.  Rather, Cordle's testimony "presented a picture of happy children with nothing but love [for Appellant and] who

displayed absolutely no signs of abuse or discontentment with their family dynamic." PCRA Court Opinion, 4/23/24, at *6 (unpaginated).

Moreover, we note that, even if Cordle's testimony set forth a potential motive for the Children to fabricate the charges against Appellant, Appellant's claim still fails. Indeed, at trial, Appellant's ex-wife, Amanda Caraballo, testified that Appellant was a "harsh disciplinarian" who, *inter alia*, hit the Children with a "wooden paddle" so "hard . . . that they would have red marks." N.T. Trial, 12/9/21-12/10/21, at 32. In addition, trial counsel cross-examined J.R. regarding Appellant's disciplinary tactics, giving way to the potential motive to fabricate claims against him. ***See id***. at 67-72. Finally, during trial counsel's closing argument, she stated:

> By [J.R's] testimony, corroborated by Amanda Carabello's testimony, [Appellant] was an alcoholic and was physically abusive to the [C]hildren. He smacked their faces and arms for talking back, hard enough to leave marks and even whipped them with a wooden paddle, wanting to even escalate that to a wooden paddle with holes in it as a more abusive means of punishment.
>
> That [is] the motive that these [Children] have to lie.

*Id.* at 221. Thus, even assuming Cordle's testimony included references to Appellant's harsh discipline and, in turn, the Children's potential motives, it would have simply duplicated the testimony elicited during Appellant's trial. Thus, it cannot be said that, if Cordle testified during trial, there was a reasonable probability of a different outcome. ***Compare Commonwealth v. Matias***, 63 A.3d 807, 813 (Pa. Super. 2013). Accordingly, we agree with the

PCRA court's assessment that Appellant's ineffectiveness claim fails for lack of prejudice.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/08/2025